**Lawrence E. FUREY, Trustee,**
**Plaintiff-Appellant,**

v.

**CITY OF SACRAMENTO, A Chartered City, County of Sacramento and Natomas Sanitation District of Sacramento County, Defendants-Appellees.**

No. 84–2429.

United States Court of Appeals,
Ninth Circuit.

Argued June 12, 1985.

Submitted Dec. 13, 1985.

Decided Jan. 21, 1986.

**1450**

Steven F. Brockhage, Thelen, Marrin, Johnson, & Bridges, San Francisco, Cal., Craig C. Thompson, Deputy Atty. Gen., Sacramento, Cal., for plaintiff-appellant.

Henry Crowle, Memering & DeMers, Lee Savage, Hyde, Miller, & Savage, Sacramento, Cal., for defendants-appellees.

Before SNEED and BEEZER, Circuit Judges, and STEPHENS *, District Judge.

SNEED, Circuit Judge:

Plaintiff Lawrence Furey appeals a grant of summary judgment in favor of defendants City of Sacramento and other municipal government entities. Furey

claims that his property was taken in violation of the United States Constitution when his land was assessed to pay for the construction of a sewer system and the defendants subsequently prevented him from developing his land and thereby making use of the sewer. We affirm the judgment of the district court.[1]

## I.

## STATEMENT OF FACTS

Plaintiff Lawrence Furey owns, as a trustee, approximately 1,157 acres in the Natomas area of Sacramento County. (The term "plaintiff" shall hereinafter be used to refer to Furey and/or his predecessor trustees). The Natomas area was unincorporated until October 1961, when it was annexed by the City of Sacramento. The land has, at all relevant times, been zoned and used solely for agricultural purposes. Nonetheless, the "Metropolitan Airport/Natomas Area Plan" adopted by the Sacramento County Board of Supervisors in 1962, the "Natomas General Development Plan" adopted by the Sacramento City Council in 1962, and the "General Plan" adopted by the Sacramento City Planning Commission in 1966 all envisioned

---

\* Honorable Albert L. Stephens, Senior United States District Judge for the Central District of California, sitting by designation.

1. Following oral argument, the parties were asked to submit additional briefs on the question whether this suit should be dismissed in light of the Supreme Court's decision in *Williamson County Regional Planning Comm'n v. Hamilton Bank*, —— U.S. ——, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). In *Williamson County*, the Court dismissed for lack of ripeness a bank's claim that county zoning regulations had effected a taking of its property in violation of the fifth amendment. The opinion advanced two alternative grounds for the result. First, because the respondent bank had not applied for variances that might have allowed greater development of its property, the government entity charged with implementing the regulations had not been given the chance to reach a *final* decision regarding the application of the regulations to the property at issue. This circumstance precluded the court from determining whether "the economic impact of [the zoning laws] and the extent to which [they] interfer[ed] with reasonable investment-backed expectations" justified a finding of a taking. *Id.* 105 S.Ct. at 3119. Sec-

ond, the bank had not sought compensation through the procedures the state provided for doing so. As a consequence, it could not claim that its property had been taken *without just compensation. See id.* at 3121.

*Williamson County* is inapposite here. As the California Supreme Court observed, Furey has obtained what amounts to a final decision regarding the application of the Open Space ordinance to his property. *See Furey v. City of Sacramento*, 24 Cal.3d 862, 871, 157 Cal.Rptr. 684, 689, 598 P.2d 844, 849, *cert. denied*, 444 U.S. 976, 100 S.Ct. 476, 62 L.Ed.2d 403 (1979). Moreover, Furey has no remaining state procedure by which to secure compensation. The California Supreme Court made clear that Furey's only remedy in a state court action would be "declaratory relief or mandate precluding the application of the subject land-use regulations" to his property. *Id.* at 877–78, 157 Cal.Rptr. at 849, 598 P.2d at 853. Because the state action would therefore have been merely a procedure for review, *see Williamson County*, 105 S.Ct. at 3121 n. 13, Furey's failure to pursue it does not disable him from bringing suit in federal court.

extensive residential and commercial development of the area, including plaintiff's land.

California's Improvement Act of 1911, California Streets and Highways Code §§ 5000–6794 (Deering 1978 & Supp.1985), authorizes city councils and county boards of supervisors to create special assessment districts within their jurisdictions to finance the construction of public improvements, including sewers, *see id.* § 5101(c). The improvements are paid for by assessments on property within the districts, rather than out of general tax revenues. *See id.* § 5343. The law requires that the assessment on each parcel of land be proportional to the benefit conferred on the parcel by the improvement. *Id. See generally* Note, *New Developments in Special Assessment Law,* 11 U.C.D.L.Rev. 43, 44 n. 4 (1978) (summarizing procedures); Comment, *The Use of Special Assessment Districts and Independent Special Districts as Aids in Financing Private Land Development,* 53 Calif.L.Rev. 364, 367–73 (1965) (same).

### A.

In 1959, three landowners in the Natomas area, not including the plaintiff, contacted Logan Muir, a private engineer, and requested that he initiate arrangements to provide sewer service to their land. Muir consulted with county government personnel regarding the prerequisites for forming a sewer assessment district. He was informed that the county's policy was not to form sewer assessment districts of less than 2500 acres. Because the holdings of the three landowners totalled only about 800 acres, Muir attempted to enlist the support of neighboring landowners to form a district of the requisite size. He sent out letters soliciting expressions of interest, and those landowners who responded were sent copies of a petition, addressed to the Sacramento County Board of Supervisors, requesting the formation of a sewer assessment district. Plaintiff Furey received, signed, and returned one such petition.

Under California's Majority Protest Act of 1931 (Protest Act), the creation of a sewer assessment district requires elaborate procedures. *See* California Streets and Highways Code §§ 2820–2830, 2850–2859, 2880–2885 (Deering 1978 & Supp. 1985). However, the procedural requirements may be waived by petition of the owners of sixty percent of the land in a proposed district. *See id.* § 2804(3). The requirements can also be waived by a recommendation from the county health officer that a sewer system is "necessary as a health measure," followed by a four-fifths vote of the county board of supervisors. *See id.* § 2808.

The petition that plaintiff signed, in addition to requesting the formation of a sewer assessment district, also waived the procedural requirements of the Protest Act. Identical petitions were signed by all of the landowners in the proposed district except one, and Muir presented the petitions to the county Public Works Department. The petitions were reviewed by the county's bond counsel, who concluded that they were legally insufficient to waive the requirements of the Protest Act because the law required that all signatures be on a single petition. Therefore, the Public Works Department did not transmit the petitions to the Board of Supervisors. Another approach was employed. An official of the Public Works Department, after a discussion with the bond counsel and Muir, requested that the county health officer recommend that construction of sewers was necessary as a health measure. The health officer inspected the area and, on June 16, 1960, signed a letter prepared by the Public Works Department making such a recommendation to the Board of Supervisors. On April 26, 1961, an identical letter was submitted to the Board of Supervisors by the succeeding county health officer. These recommendations, which sufficed to waive the requirements of the Protest Act, *see id.* § 2808, were approved by resolutions of the Board.

On June 22, 1961, the Sacramento City Council adopted a resolution consenting to the creation of a sewer assessment district

by the county Board of Supervisors. After a hearing on July 17, 1961, at which no landowner protested, the Board created the Natomas Sewer Assessment District and authorized the levying of assessments and the letting of a contract for construction of sewers and a sewage treatment plant. No property was included in the assessment district unless the owner had either signed a petition requesting creation of the district or, in one case, personally requested that his property be included. One couple that had signed a petition were permitted to withdraw their property from the district when they changed their minds.

The sewer system and the treatment plant were designed by Muir's firm, Packard, Muir, & Train, Inc. Construction of the system began in 1961 and was completed in 1965. Upon completion of the system, the cost of construction and design was allocated among the landowners in the district, with assessments roughly proportional to acreage. The assessment on plaintiff's property was approximately $840,000.

The county then raised the money to pay for the construction by issuing bonds, secured by the assessed property, in the amount of the assessments. *See* California Streets and Highways Code §§ 6400–6632 (Deering 1978 & Supp.1985). The landowners are responsible for the payment of principal and interest on the bonds. To date, the plaintiff has paid more than $825,000 in principal and interest.

In the period from 1965 to 1973, plaintiff's property remained zoned "agricultural" and was used for agricultural purposes. Plaintiff did not attempt to rezone or develop the property.

On June 7, 1973, the Sacramento City Council adopted an ordinance creating a new zoning classification called "Agriculture—Open Space." On the same day, the Council added the Open Space Element to its General Plan. The Open Space Element zoned plaintiff's land as "Agriculture—Open Space" and required that it remain so zoned.

The zoning classification prevents the plaintiff from developing his land for either commercial or residential purposes. The parties agree that plaintiff has not received any benefit from the sewer system, and, as long as plaintiff's land remains zoned "Agriculture—Open Space," plaintiff will not receive any benefit from the sewer system. Plaintiff's land continues to be used profitably for agriculture.[2]

### B.

In 1974, plaintiff brought suit in both the California Superior Court for Sacramento County and the United States District Court for the Eastern District of California, alleging that his property had been taken without just compensation, in violation of article I, section 19 of the California Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. The federal court abstained pending resolution of the state constitutional claim in the state court.

Plaintiff's state court action sought relief under three principal theories:

(1) The designation of plaintiff's land as open space constituted a partial taking of plaintiff's land, for which plaintiff was entitled to be compensated in the amount of the difference between the value of the land when used for agricultural purposes and the value of the land when used for residential and commercial purposes.

(2) The designation of plaintiff's land as open space constituted a taking without just compensation of plaintiff's right of access to the sewer system.

(3) In the absence of any benefits to plaintiff from the sewer system, the assessment of $840,000 to pay for the sewer system constituted a taking of plaintiff's property (money) without just compensation.

---

**2.** The parties have brought to the attention of the court the fact that plaintiff has recently sold his land. This fact is not relevant to plaintiff's claim for reimbursement of his sewer assessment.

The defendants in the state court action entered a demurrer. The state court sustained the demurrer and dismissed the action, and the plaintiff appealed.

On appeal, the California Supreme Court affirmed the dismissal with respect to plaintiff's first two theories, but reversed the dismissal with respect to the third theory and remanded the case to the state trial court. The court held that, if the facts were shown to be as alleged in plaintiff's complaint, plaintiff was entitled either to be relieved from the application of the Open Space ordinance or to be refunded the amount of his sewer assessment. *See Furey v. City of Sacramento*, 24 Cal.3d 862, 875–76, 157 Cal.Rptr. 684, 691–92, 598 P.2d 844, 851–52, *cert. denied*, 444 U.S. 976, 100 S.Ct. 476, 62 L.Ed.2d 403 (1979). In a footnote, however, the court stated that this case is "[t]o be distinguished [from] cases in which the construction of public improvements is undertaken on the initiative of the property owner himself. [citation omitted] In such a situation, barring strong evidence of governmental inducement or promotion, the property owner stands in the position of a volunteer who, in the event of intervening regulation barring use of the improvement in the public interest, cannot be heard to complain of the loss of his investment." *Id.* at 875 n. 8, 157 Cal.Rptr. at 691 n. 8, 598 P.2d at 851 n. 8.

After the California Supreme Court handed down its decision, the plaintiff did not further pursue his state court action. The plaintiff reactivated his federal court action with the filing of an amended complaint. The amended complaint asserted only federal constitutional claims.[3]

Because the California Supreme Court was reviewing the granting of defendants' demurrer, it assumed the truth of plaintiff's allegation that the government had initiated the assessment district, and it did not consider defendants' allegation that the plaintiff himself, acting in concert with other landowners, had initiated the district. In the district court, both sides moved for partial summary judgment on this issue in July of 1982. The court granted defendants' motion, finding that "[a]s a matter of law, neither the County nor the City initiated, promoted, or induced the formation of the District." *Furey v. City of Sacramento*, 592 F.Supp. 463, 480 app. (E.D.Ca.1984). On August 3, 1984, the district court, relying on a set of stipulated facts and on its previous partial summary judgment, rendered summary judgment in favor of defendants on all of plaintiff's claims. *Id.* at 465–74. The plaintiff appeals both the grant of partial summary judgment and the final summary judgment. On appeal, plaintiff has abandoned his theories that the state constructively condemned either his land or his right of access to the sewer.[4]

---

**3.** Plaintiff's claim in this action raises only issues of federal constitutional law. Therefore this court is not bound under the doctrine of *stare decisis* by the decision of the California Supreme Court in the state court action. Nor does the California Supreme Court's opinion have a *res judicata* effect on this case, both because the federal court explicitly retained jurisdiction over the federal issues, *Furey v. City of Sacramento*, 592 F.Supp. 463 (E.D.Cal.1984); *see England v. Louisiana State Bd. of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964) (abstaining federal court retains power to decide federal issues), and because the state court action was not pursued to final judgment, *see United States v. Dann*, 572 F.2d 222, 225–26 (9th Cir.1978).

**4.** The district court properly rejected plaintiff's first two theories. Defendants correctly argue that the right to beneficial use of the sewer is not a discrete form of property that can be

severed from the rest of plaintiff's land-ownership rights for purposes of takings analysis. *Cf. Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 130, 98 S.Ct. 2646, 2662, 57 L.Ed.2d 631 (1978) (rejecting claim that city had taken air rights by preventing owner from extending building vertically and observing that "[t]aking jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated"); *MacLeod v. Santa Clara County*, 749 F.2d 541, 547 (9th Cir.1984) (denial of permission for plaintiff to harvest timber from his land did not constitute a compensable taking of timber rights), *cert. denied*, — U.S. ——, 105 S.Ct. 2705, 86 L.Ed.2d 72 (1985). The application of a general zoning law to particular property effects a taking only if the owner is denied all economically viable use of the land. *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); *MacLeod*, 749 F.2d at 545. Because plaintiff

**1454**

He asserts only his theory that, because he has been denied any benefit from the sewer, the sewer assessment itself constitutes a taking of his property without just compensation.

## II.

## DISCUSSION

### A.

Appellant derives comfort from cases such as *Norwood v. Baker,* 172 U.S. 269, 19 S.Ct. 187, 43 L.Ed. 443 (1898), and *Myles Salt Co. v. Board of Commissioners,* 239 U.S. 478, 36 S.Ct. 204, 60 L.Ed. 392 (1916). In *Norwood* the Supreme Court held that a local government takes private property without just compensation when, through a special assessment on land, it compels a landowner to pay for a public improvement in an amount "in substantial excess of the special benefits accruing to him." *Id.,* 172 U.S. at 279, 19 S.Ct. at 190. This principle was reiterated in *Myles Salt,* where the Court struck down the inclusion in a drainage district of elevated land that had no need of drainage and therefore could derive no benefit from the construction of drainage ditches. The Court stated that when a special assessment district is "formed to include property which is not and cannot be benefited directly or indirectly, ... there is an abuse of power and an act of confiscation." *Id.,* 239 U.S. at 485, 36 S.Ct. at 206.[5] Put in general terms, government may not force a landowner to make an improvement that, while valuable to others, is useless to him.

In contrast, when a private landowner, acting either alone or in cooperation with neighboring landowners, undertakes to construct improvements at his own expense, no government taking has occurred when a subsequent exercise of the government's police power restricts the landowner's ability to make use of the improvement. *See Avco Community Developers, Inc. v. South Coast Regional Commission,* 17 Cal.3d 785, 132 Cal.Rptr. 386, 553 P.2d 546, *cert. denied,* 429 U.S. 1083, 97 S.Ct. 1089, 51 L.Ed.2d 529 (1976). The regulatory acts of government may result in detriment or benefit to landowners. Generally, however, government neither insures against the former nor seeks recompense for the latter. Thus, a private landowner, by making an investment to improve the value of his land, may not deprive a local government of its inherent police power, which includes the power to place reasonable restrictions on the use of that land. The line is crossed when such restrictions either do not serve a legitimate governmental interest or deprive a landowner of all economically viable use of his land. *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). Only then is there a compensable taking. As long as economically viable uses remain, the government has not committed a taking simply by preventing the landowner from making use of an improve-

concedes that agriculture remains an economically viable use of his land, he is not entitled to compensation for a taking either of his land or of his ability to use the sewer system.

5. The Supreme Court subsequently limited the principle announced in *Norwood.* *See Louisville & N.R.R. v. Barber Asphalt Paving Co.,* 197 U.S. 430, 25 S.Ct. 466, 49 L.Ed. 819 (1905) (Constitution does not require precise equality of burdens and benefits, and potential benefits may satisfy constitutional requirements even though they are not actually realized in the present use of the assessed land); *French v. Barber Asphalt Paving Co.,* 181 U.S. 324, 21 S.Ct. 625, 45 L.Ed. 879 (1901) (upholding assessment for street paving based on front footage, without more precise determination of benefit to each parcel of land). *Norwood* and *Myles* have rarely been invoked in the federal courts in the past seventy years; litigation challenging special assessments has concentrated in the state courts. *See* Ellickson, *Suburban Growth Controls: An Economic and Legal Analysis,* 86 Yale L.J. 385, 472–73 (1977); Yudof, *The Property Tax in Texas Under State and Federal Law,* 51 Tex.L.Rev. 885, 913–14 (1973); McQuillin, 14 *Municipal Corporations* § 38.02 (Latta 3d ed. 1970) (collecting cases). The continuing validity of the *Norwood-Myles* principle as a matter of federal constitutional law has been questioned. *See* F. Michelman & M. Sandalow, *Government in Urban Areas* 523–24 (1970); Yudof, *supra,* at 913–14. For purposes of this discussion we assume, but do not decide, that *Norwood* and *Myles* continue to be valid.

ment that he has undertaken of his own accord.

██ These two lines of authority indicate that whether a taking has occurred depends on whether the construction of an improvement, from which no benefit is derived, is action that a landowner has been compelled by government to undertake and pay for or is rather a private investment voluntarily undertaken. If the construction was compelled, the landowner must be given the opportunity to make beneficial use of the improvement or must be refunded the amount of the assessment. If the construction was voluntary, however, no compensation is due.[6]

### B.

██ The distinction is not an easy one to draw. The fact that assessment procedures authorized by the Improvement Act are invoked by a local government does not conclusively establish that a government taking has occurred. Public and private action are frequently intertwined. Private landowners and developers, for example, frequently seek and obtain the cooperation of local governments in financing development. The creation of an assessment district permits the issuance of tax-free bonds that enable the landowners and developers to obtain capital at lower interest rates than they would have to pay in the private capital market. *See* Note, *The Use of Special Assessment Districts and Independent Special Districts as Aids in Financing Private Land Development*, 53 Calif. L.Rev. 364, 364–67 (1965). Although local governments have the power to create such districts without the consent of landowners, the districts sometimes serve as mere conduits for voluntary private investments by the landowners. When, in such cases, government merely assists landowners in obtaining money on favorable terms, it does not thereby become responsible for ensuring that the investment

yields its expected benefits notwithstanding subsequent regulatory action. Within the limits here indicated, government is not an entirely dependable joint venturer.

██ The California Supreme Court suggested that the distinction turns on who initiated the formation of the assessment district, and on whether there was significant governmental inducement or promotion. *See Furey*, 24 Cal.3d at 875 n. 8, 157 Cal.Rptr. at 691 n. 8, 598 P.2d at 851 n. 8. While these factors are important, the determination should take into account all of the facts and circumstances surrounding the levying of an assessment. The factors to be considered include, but are not necessarily limited to, (1) whether the assessment was initiated by the government or by the owners of the assessed property, (2) whether the government actively induced or promoted the assessment, (3) whether the property of any nonconsenting landowners was subject to the assessment, (4) whether the design of the improvement was under the control of the assessed landowners or reflected their intentions and needs, and (5) whether the improvement was designed to yield substantial benefits to the public at large. This list is not exhaustive; other factors not listed here but apparent in other factual situations may assume equal or greater importance. Be that as it may, consideration of the above factors in this case leads us to conclude that the assessment at issue falls on the private investment side of the line. Therefore, the plaintiff is not entitled to relief.

#### 1. *Initiation of the Assessment*

The stipulated facts in this case reveal that the creation of the assessment district was initiated by landowners within the district and not by the government. The initial impetus came from the three landowners who approached the private engi-

---

6. In this case, defendants also argue that plaintiff received compensation for the assessment in the form of an opportunity to make use of the sewer in the seven years between the time it was created and the time that his land was designated "Agriculture—Open Space." Since we conclude that plaintiff is not entitled to compensation because the sewer assessment constituted a voluntary private investment, we need not address the merits of this argument.

neer and requested his help in providing sewer service. Although the engineer then contacted county personnel, their role at that time was limited to informing the engineer of the minimum size that the county would require for a sewer assessment district. The engineer proceeded to solicit the support of other landowners in the proposed district and to mail out petitions for their signatures. The county did not participate in the solicitation, and no county funds were involved. County personnel became active in the formation of the district only after the county received petitions signed by all but one of the landowners in the proposed district.

## 2. Government Inducement or Promotion

Although county personnel did act to enable formation of the district after receipt of the petitions, their actions merely facilitated the action requested by the landowners. The letters to the Board of Supervisors from the county health officers had the effect of waiving the procedural requirements of the Majority Protest Act. Those requirements would have been waived by petition of the landowners but for the fact that the landowners had submitted individual petitions instead of affixing their signatures to a single, common petition. Thus, the only practical effect of the letters was to relieve the landowners of the expense and inconvenience of circulating a new petition. Such facilitation by county personnel, absent other substantial county involvement, does not constitute sufficient government inducement or promotion to render the assessment a government taking.

## 3. Consent

An essential factor in our conclusion that the assessment in this case amounted to a voluntary private investment is the fact that every landowner in the district either signed a petition requesting formation of the district or personally requested that his property be included in the district. We acknowledge that a party whose property is subject to an assessment without his consent may not be charged with having made a private decision to invest in an improvement. Further, the imposition of an assessment on one or more nonconsenting owners may lend a sufficient imprimatur of official government action on the assessment to render it a government taking with respect to all assessed landowners. In this case, however, all of the owners not only consented to, but in fact requested the inclusion of their property in the assessment district.

## 4. Design of the Improvement

A fourth factor concerns the extent to which the design of the improvement is under the control of the assessed landowners and conforms to their needs and desires. Even when an assessment district is initiated by the landowners, its formation must be considered an independent government action if the improvement is ultimately designed and constructed by the government in a manner that does not reflect the landowners' intentions or serve their needs. See, e.g., Louisville v. Benedict, 147 Ky. 391, 144 S.W. 43 (1912) (plaintiff signed petition requesting street improvement, but improved street constructed so as to be inaccessible from plaintiff's property); Birdseye v. Village of Clyde, 61 Ohio St. 27, 55 N.E. 169, 171 (1899) (landowners' petition "must be construed ... so as to effectuate the manifest intention of the parties"). Here, however, there is no evidence or argument that the sewer system that was completed in 1965 did not conform to the intentions of the property owners who initiated, and were assessed for, its construction. The landowners, including the plaintiff, received the system for which they petitioned and paid. The system was designed by the private firm that three of the landowners had engaged to initiate the creation of the assessment district. The firm was paid out of the assessments, not out of county funds. No landowner was heard to complain about the system until seven years later, when the plaintiff initiated this action as a result of the adoption of the city's new General Plan.

## 5. *Public Benefit*

A final factor to be considered is whether the improvement in question was designed to yield substantial benefits to the public at large. Although incidental benefits to the general public may flow from a purely private investment, the existence of such benefits does not transform a private decision into a public one. It is clear in this case that the primary benefit of the sewer was the facilitation of residential and commercial development on the property in the assessment district. The sewer system made it possible to proceed with such development without violating health and sanitary standards. The plaintiff in this case was ultimately unable to share in this benefit, but his misfortune did not spring from an investment government required him to make.

Consideration of the factors enumerated above leads us to hold that the plaintiff did not become entitled to compensation when the designation of his land as "Agriculture—Open Space" deprived him of the opportunity to make use of the system. He did not suffer a compensable taking under the United States Constitution.

AFFIRMED.