921 F.2d 610
 59 USLW 2475
 FEDERAL DEPOSIT INSURANCE CORPORATION, as Managing Agent for
FSLIC Resolution Fund, as Receiver for Alliance
Federal Savings and Loan Association,
Plaintiff-Appellant,
v.
CITY OF NEW IBERIA and Sewerage District No. I of the City
of New Iberia, Louisiana, Defendants-Appellees.
 No. 89-4658.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 23, 1991.
 
 Stephen L. Williamson, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, La., G. Tim Alexander, III, Mouton & Alexander, Lafayette, La., for plaintiff-appellant.
 Minos H. Armentor, Armentor & Wattigny, New Iberia, La., for defendants-appellees.
 R. Gordon Kean, Jr., Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, La., for amicus La. Mun. Assoc.
 Appeal from the United States District Court for the Western District of Louisiana.
 Before POLITZ, JONES, and BARKSDALE, Circuit Judges.
 EDITH H. JONES, Circuit Judge:
 
 
 1
 Clad in the garb of a crusader for equitable tax practices, a federal government agency, the FDIC,[1] objects to the City of New Iberia, Louisiana's tax liens covering special assessments for a paved street and sewage system built on a developer's property. FDIC contends that the assessments and liens were imposed in violation of the due process clause because under Louisiana law the recordation of the liens, which "prime" that of FDIC, represent a "taking" of FDIC's mortgage interest without prior notice, hence without due process of law. We cannot agree with FDIC's initial premise that the levying of a special assessment and lien for these public improvements, to support their construction with public funds, constitutes a "taking" in this case. Consequently, we affirm the district court's judgment.
 
 I.
 
 2
 FDIC sparked this controversy as receiver of Alliance Federal Savings & Loan Association, the entity which loaned $3 million to the developers so that they could purchase property including Iberia Southport Subdivision part III. The relevant facts were stated by the district court as follows:
 
 
 3
 "On September 23, 1983, Alliance loaned $3 million to George Oubre and John Levy. The loan was secured by [two mortgages] in favor of Alliance on land identified as the Iberia Southport Subdivision. Iberia Southport Subdivision, in turn, consisted of parts I, II and III, of which parts I and II had been formally subdivided at the time of the loan.
 
 
 4
 "Parts I and II consist of single and multi-family dwellings, as well as a number of vacant lots zoned for either residential or commercial use. Street and sewerage improvements were constructed in parts I and II by the city pursuant to action by the New Iberia Board of Trustees in 1976 and 1979. In conjunction with those improvements, the city imposed special assessments to be paid in ten annual installments and guaranteed by liens on parts I and II. Upon default of the installments due June 1, 1984, the city brought foreclosure actions which eventually resulted in the developer-owned lots in parts I and II being sold at a sheriff's sale in 1986. Alliance, as mortgagee, was named as a defendant in the foreclosure proceedings, and eventually purchased a number of the available lots at the sheriff's sale. The city purchased most of the remaining lots. Since the sheriff's sale, however, the city has resold just one lot.
 
 
 5
 "Parts I and II of Iberia Southport were accessible only from the north. In order to ease the traffic congestion at the north end of the subdivision, Oubre and Levy petitioned the city to construct a new street, Romero Drive, through the as yet undeveloped part III of the subdivision. Romero Drive was positioned to connect the south end of Southport Boulevard, the main north-south artery within the subdivision, with Jefferson Terrace outside the subdivision. Construction of Romero Drive also would be a major first step toward the eventual future development of part III. Oubre and Levy, as owners of the property on both the north and south sides of the proposed Romero Drive, filed their petition with the city, in accordance with La.Rev.Stat. Sec. 33:3331, on November 18, 1983. Oubre and Levy, their spouses, James Romero, and Marie Land Surveying Co., collectively purporting to constitute the owners of 100% of all land fronting both Southport Boulevard and Romero Drive, executed the petition for street and sewer improvements on May 9, 1984.
 
 
 6
 "On June 19, 1984, the Board of Trustees passed a resolution which expressed the city's intent to proceed with the requested improvements, and which directed that public hearings regarding the improvements be advertised and conducted. According to the text of the resolutions, as well as the testimony of various city officials, public hearings are routinely held in order to allow the mayor and Board of Trustees to determine the existence and extent of any opposition to the proposed improvements. In addition, the resolution stipulated that '[t]he question of the benefit to each lot or parcel of real estate to be assessed as a result of the construction of said improvements shall also be considered at said public hearing.' The hearings for the proposed construction of Romero Drive and related sewerage improvements were advertised in the Daily Iberian. No direct notice of the hearings was given to Alliance, as mortgagee of the subject property. When the public hearings were conducted on July 17, 1984, the city received no objection to the proposed projects. No evidence was presented at trial to indicate that any testimony at the hearing concerned the cost-benefit issue.
 
 
 7
 "On August 21, 1984, the Board of Trustees passed a pair of resolutions approving the street and sewer construction, directing the city's consulting engineers to prepare plans and specifications for the projects, and directing that the total cost be charged to the lots abutting the proposed improvements. The resolutions also recited a finding by the Board of Trustees that 'each lot or parcel of real estate be assessed ..., as a result of the construction of [the paving and sewerage] improvements, will be benefited to an amount not less than the amount of the estimated assessment to be levied against each such lot or parcel of real estate.' On January 24, 1985, the engineering report, including the estimated cost of the projects, was filed with the city. On February 19, 1985, the Board of Trustees passed a pair of resolutions which (1) accepted the engineering report; (2) recited a finding that the benefit inuring to each parcel of real estate abutting the proposed improvements will equal or exceed the amount of the special assessment to be imposed against each such parcel; and (3) directed that each abutting property owner be notified of the improvements, and of the amount and time and manner of repayment of the special assessment. The city executed a contract for construction of the improvements on March 12, 1985. Finally, on April 16, 1985, the city adopted ordinances 327 and 328, which imposed special assessments of $52.60 and $16.10, respectively, per front foot on each parcel of real estate abutting on Romero Drive and the portion of Southport Boulevard improved by the street paving and sewerage project. The ordinances also directed that a lien be imposed against each specially assessed parcel of real estate, which lien primed all other liens and mortgages except prior taxes or recorded assessments. The total amount of the special assessments was $217,194.36. At no time was either Alliance or FSLIC, as mortgagee, notified of any of these actions or improvements concerning the property.
 
 
 8
 "The construction was completed in March of 1986. On April 16, 1986, Oubre and Levy defaulted on the first installment payment on the special assessments. The city consequently initiated foreclosure proceedings in the 16th Judicial District Court, Iberia Parish, Louisiana. Those proceedings eventually resulted in a sheriff's sale of the subject land, of which the FSLIC had no advance notice, and at which the city purchased all the land up for sale.
 
 
 9
 "Following the commencement of the state foreclosure proceeding, FSLIC brought this action challenging the imposition, without notice to FSLIC or Alliance, as mortgagee, of the special assessment and the lien which primed the outstanding mortgage. FSLIC seeks a declaration that the special assessment and lien, and the manner in which they were imposed, impaired the value of FSLIC's property interest without due process, in violation of the Fourteenth Amendment to the U.S. Constitution. Ultimately, FSLIC desires that the lien and special assessment be either invalidated or subordinated in priority to Alliance's prior recorded mortgages now held by FSLIC."
 
 II.
 
 10
 Although the district court satisfied itself as to jurisdiction and the parties have not since raised the issue, it is worthwhile to explain why this case is not barred by the Tax Anti-injunction Statute, 28 U.S.C. Sec. 1341. Section 1341 deprives federal courts of jurisdiction to enjoin, suspend or restrain the assessment, levy or collection of any tax under state law except where no plain, speedy and efficient remedy is available in state courts. While the goal of the statute is to reinforce federalism and comity with the states in matters of local taxation, that goal is not subserved when the local authorities have attempted to tax an instrumentality of the federal government. Consequently, the Supreme Court has concluded,
 
 
 11
 in accord with an unbroken line of authority and convincing evidence of legislative purpose that Sec. 1341 does not act as a restriction upon suits by the United States to protect itself and its instrumentalities from unconstitutional state exaction. (citing five cases)
 
 
 12
 Department of Employment v. United States, 385 U.S. 355, 358, 87 S.Ct. 464, 466, 17 L.Ed.2d 414 (1966). Applying this principle in the course of a decision that Massachusetts could not tax materials used in the construction of a new Federal Reserve Bank building, the First Circuit accepted
 
 
 13
 ... the absence of any bright line to facilitate the analysis [of jurisdiction]; each instrumentality must be examined in light of its governmental role and the wishes of Congress in relevant legislation.
 
 
 14
 Federal Reserve Bank of Boston v. Commissioner of Corporations & Taxation, 499 F.2d 60, 64 (1st Cir.1974). That FSLIC and FDIC are federal agencies exempt from the operation of Sec. 1341 may hardly be doubted. Federal court jurisdiction over their cases has been broadly authorized. See, e.g., 12 U.S.C. Sec. 1730(k)(1), 28 U.S.C. Sec. 1341 on this basis the federal courts may assert jurisdiction over this case.
 
 III.
 
 15
 An earlier, unpublished appearance of this case in our court has affected the current presentation of its issues. See FSLIC v. City of New Iberia, 847 F.2d 838 (5th Cir.1988). New Iberia originally moved for a summary judgment on the basis that its procedures in assessing the improvements liens afforded due process to FDIC. Ignoring this point, the district court chose instead to predicate a summary judgment on the FDIC's inability to demonstrate that the benefits conferred on the real estate by the public improvements were less than the tax assessments levied to pay for them. On appeal, this court reversed simply because, as FDIC protested, the agency had been caught unaware by the district court's sua sponte rationale. This court observed some skepticism, however, as to whether such a cost-benefit calculus may lead to an unconstitutional taking of property.
 
 
 16
 Not heeding the Fifth Circuit's warning, the parties framed the debate on remand as a battle of experts over the precise measurement of the improvements' costs and benefits. The district court decided the case in these terms, and the parties' appellate dispute centers on whether a "taking" should be measured based on the comparison between the assessment for the improvements (about $217,000) and the property's appraised value either at the date they were first authorized by the city (August 21, 1984) or the date the special assessments and liens were imposed (April 16, 1985).[2]
 
 
 17
 FDIC's entire argument may thus be easily summarized. The district court acknowledged that New Iberia gave no notice to FDIC or its predecessors before it approved the improvements and the special assessments and liens to reimburse the city. The Fourteenth Amendment is violated by a taking without notice of FDIC's mortgage interest if a "taking" actually occurred. Whether a taking occurred depends on whether the improvements increased the value of the property in an amount equal to or greater than their costs. Finally, the date upon which a taking must be measured is the date on which state action " 'immediately and drastically diminish[ed] the value of [FDIC's] interest.' " Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 798, 103 S.Ct. 2706, 2711, 77 L.Ed.2d 180 (1983) (citing Mullane v. Central Hanover B. & T. Co., 339 U.S. 306, 313-14, 70 S.Ct. 652, 656-57, 94 L.Ed. 865 (1950)). FDIC contends that such date is the date of recordation of the city's liens.
 
 
 18
 The Mennonite decision, on which FDIC relies, is grounded on the recognition that "a mortgagee possesses a substantial property interest that is significantly affected by a tax sale [under Indiana law].... The tax sale immediately and drastically diminishes the value of this security interest by granting the tax-sale purchaser a lien with priority over that of all other creditors." 462 U.S. at 798, 103 S.Ct. at 2711. The Court accordingly held that a state may not conduct a tax sale of property without mailing notice to any interest holder, such as a mortgagee, who is reasonably identifiable on the public records. Id. Notice to the property owner alone is not equivalent to notice to the mortgagee. Id.
 
 
 19
 Although Mennonite espoused a far-reaching requirement of notice to property owners adversely affected by state actions,[3] the case did not analyze, beyond its straightforward facts, what constitutes a "deprivation" of property. It is hardly arguable that under Indiana's law, the interest of a mortgagee is "drastically diminished" by a tax sale that yields a lien with priority over all recorded interests. Mennonite in no way suggested, however, that the taxing authority's decision to levy taxes, which resulted in the unpaid assessment on the underlying property, similarly affected the mortgagee or demanded adequate notice to the mortgagee. Yet FDIC's position in this court, because it rests on the issue whether New Iberia's special assessment was matched by the value of improvements conferred on the subdivision, inextricably entwines the legislative decision to tax with the procedural question of notice. This troubling connection, not envisioned by Mennonite, proves to be the Achilles' heel of FDIC's argument.
 
 
 20
 We cannot agree that FDIC's mortgage interest was "taken" by New Iberia. Perhaps the skeptical caution in our earlier opinion was too subtle. It seems clear that the parties' emphasis on precise measurement of the costs and benefits of the municipal improvements misplaces, at least in this context, the focus of constitutional takings analysis.[4]
 
 
 21
 The course of Supreme Court decisions on this subject is not entirely smooth,[5] but the majority of its more recent decisions have hesitated to place federal courts in the business of reviewing local tax decisions by comparing the cost of special assessments with the value of improvements. Justice Holmes's analysis effectively refutes FDIC's cost-benefit theory of judicial review:
 
 
 22
 There is a look of logic when it is said that special assessments are founded on special benefits, and that a law which makes it possible to assess beyond the amount of the special benefit attempts to rise above its source. But that mode of argument assumes an exactness in the premises which does not exist. The foundation of this familiar form of taxation is a question of theory. The amount of benefit which an improvement will confer upon particular land--indeed, whether it is a benefit at all--is a matter of forecast and estimate. In its general aspects, at least, it is peculiarly a thing to be decided by those who make the law. The result of the supposed constitutional principle is simply to shift the burden to a somewhat large taxing district,--the municipality,--and to disguise, rather than to answer, the theoretic doubt. It is dangerous to tie down legislatures too closely by judicial constructions not necessarily arising from the words of the Constitution. Particularly, as was intimated in Spencer v. Merchant, 125 U.S. 345, 31 L.Ed. 763, 8 Sup.Ct.Rep. 921, it is important for this court to avoid extracting from the very general language of the Fourteenth Amendment a system of delusive exactness in order to destroy methods of taxation which were well known when that amendment was adopted, and which it is safe to say that no one then supposed would be disturbed.
 
 
 23
 Louisville and N.R. Co. v. Barber Asphalt Paving Co., 197 U.S. 430, 25 S.Ct. 466, 49 L.Ed. 819 (1905). In a series of cases decided just a few years earlier, the Court emphasized that local tax assessments would not contravene the Fourteenth Amendment unless they amounted to such an abuse as to be an outright confiscation of property. French v. Barber Asphalt Paving Co., 181 U.S. 324, 21 S.Ct. 625, 45 L.Ed. 879 (1901); Wight v. Davidson, 181 U.S. 371, 21 S.Ct. 616, 45 L.Ed. 900 (1901); Town of Tonawanda v. Lyon, 181 U.S. 389, 21 S.Ct. 609, 45 L.Ed. 908 (1901); Webster v. City of Fargo, 181 U.S. 394, 21 S.Ct. 623, 45 L.Ed. 912 (1901); Cass Farm Company v. City of Detroit, 181 U.S. 396, 21 S.Ct. 644, 45 L.Ed. 914 (1901); City of Detroit v. Parker, 181 U.S. 399, 21 S.Ct. 624, 45 L.Ed. 917 (1901).
 
 
 24
 FDIC has never contended that New Iberia's special assessment was confiscatory. See Tonawanda, 181 U.S. at 391, 21 S.Ct. at 610. Indeed, its expert witness simply contended that the sewage and paving improvements constructed at Southport Subdivision part III failed to increase the real estate value proportionately to their cost and were ill-advised in a declining local real estate market. French and Barber do not support a constitutional challenge to the assessments on this basis.
 
 
 25
 But more important, to engage in this second-guessing as if New Iberia forced the improvements upon the subdivision and FDIC is specious. Unlike the above-cited special assessment cases that made their way to the Supreme Court, this one started with the landowners' request to New Iberia for aid in improving their property. "When, in such cases, government merely assists landowners in obtaining money on favorable terms [because of its lower costs to make public improvements], it does not thereby become responsible for ensuring that the investment yields its expected benefits...." Furey v. City of Sacramento, 780 F.2d 1448, 1455 (9th Cir.1986). If, as in Furey, the owner-developers of Southport Subdivision III were contesting the assessment after they petitioned for the paving and sewage improvements, no constitutional taking would be recognized. That the result should differ in this scenario because a mortgagee makes the claim is unthinkable. The mortgagee's interest in the property is derivative from that of the owner. To allow the mortgagee to assert an unconstitutional taking because of a special assessment sought by the landowner would allow the mortgagee potentially to receive whatever benefit did result from the improvements without having to pay for them. Moreover, this claim by the mortgagee would place an impossible, if not absurd, burden upon the taxing authority: to police the landowner's requests for assistance with improvements so that his mortgagee will not be discomfited by the ensuing special assessments. FDIC's implicit plea for governmental paternalism in an area normally controlled by sophisticated contractual relationships is as strange as it is unsupported by precedent.
 
 
 26
 On any one of several grounds, then, we reject the claim that New Iberia deprived FDIC's predecessor of its property when it imposed a special assessment to pay for the public improvements on Southport Part III. First, the Fourteenth Amendment comprehends a challenge to a special tax assessment only if it is so palpably punitive or arbitrary as to confer no benefit on the landowner, or "force[s] a landowner to make an improvement that, while valuable to others, is useless to him." Furey, 780 F.2d at 1454. Second, if a landowner requests the improvements for which a special assessment is levied by a taxing authority, neither he nor those whose interests derive from him may challenge the legislature's ascription of benefit to the landowner. See Furey v. City of Sacramento, 780 F.2d at 1445. Finally, a mortgagee may not insist that the taxing authority protect it from an imprudent special assessment levied because of the mortgagor's request.
 
 
 27
 Because FDIC was not deprived of its property by the assessment of a special improvements lien at the request of its mortgagee, no issue of constitutionally adequate notice arises.
 
 IV.
 
 28
 For these reasons, the judgment of the district court granting summary judgment to the City of New Iberia is AFFIRMED.
 
 
 
 [1]
 After passage of the FIRREA by Congress, FDIC substituted for FSLIC as plaintiff. References to FDIC here thus also identify its predecessors, FSLIC and Alliance Federal Savings & Loan, the institution taken over by FSLIC
 
 
 [2]
 As amicus curiae, the Louisiana Municipal Association does contend that the levying of a special assessment for local improvements does not, absent special circumstances, violate the Fourteenth Amendment
 
 
 [3]
 See the detailed discussion of Mennonite and later Supreme Court cases in Davis Oil Co. v. Mills, 873 F.2d 774 (5th Cir.1989). See also Rubin & Carter, Notice of Seizure in Mortgage Foreclosures and Tax Sale Proceedings: The Ramifications of Mennonite, 48 La.L.Rev. 535, 541-44 (1988)
 
 
 [4]
 Compare Agens v. Tiburon, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980) ("The application of a general zoning ordinance to particular property effects a taking if the ordinance does not substantially advance legitimate state interests ... or denies an owner economically viable use of his land...." [citations omitted]
 
 
 [5]
 In Norwood v. Baker, 172 U.S. 269, 19 S.Ct. 187, 43 L.Ed. 443 (1898), and later in Myles Salt Co. v. Board of Commissioners, 239 U.S. 478, 36 S.Ct. 204, 60 L.Ed. 392 (1916), the Court seemed to suggest that a special tax burden that was imposed in substantial excess over the landowner's benefit might be struck down. Norwood, at least, seems to have been limited by the French series of cases, infra