**TAHOE–SIERRA PRESERVATION COUNCIL, INC., a California nonprofit corporation and membership organization, Plaintiffs–Appellants,**

v.

**TAHOE REGIONAL PLANNING AGENCY, a separate legal entity created pursuant to an interstate Compact between the States of California and Nevada, et al., Defendants–Appellees.**

No. 86–2266.

United States Court of Appeals, Ninth Circuit.

Argued June 10, 1987.

Submission Withdrawn July 16, 1987.

Resubmitted May 18, 1989.

Decided Aug. 9, 1990.

Amended Aug. 27, 1990.

Lawrence L. Hoffman, Hoffman, Lien, Faccinto & Spitzer, Tahoe City, Cal., for plaintiffs-appellants.

Gary A. Owen, Crowell, Susich, Owen & Tackes, Carson City, Nev., Marta Adams, Deputy Atty. Gen., Carson City, Nev., and Richard M. Frank, Deputy Atty. Gen., Sacramento, Cal., for defendants-appellees.

Before FLETCHER, REINHARDT and KOZINSKI, Circuit Judges.

PER CURIAM:

We consider whether the plaintiffs' fifth and fourteenth amendment challenges to the defendants' 1984 Regional Plan have been rendered moot by the defendants' revocation of the challenged plan and its replacement with a substantially different one. We also consider whether the plaintiffs' claims are ripe for adjudication in federal court.

## I. Facts

This case involves a challenge by 365 property owners on the Nevada side of the Lake Tahoe basin who claim that the ban on development established by Tahoe Regional Planning Agency ("TRPA")[1] Ordinance 81–5 (enacted June 25, 1981) and made permanent by the 1984 Regional Plan (enacted April 26, 1984) deprived them of all economically feasible use of their land, and also violated their right to due process and equal protection. The plaintiffs are divided into two groups: the first is composed of those who own land in areas classified as Stream Environment Zones (the "SEZ plaintiffs"); the second of those who own land in Class 1, 2, and 3 areas (the "Class 1, 2, and 3 plaintiffs"). All of the plaintiffs seek declaratory and injunctive relief as well as damages. The specific claims are as follows:

**First Claim for Relief:** The SEZ plaintiffs seek declaratory and injunctive relief against TRPA and the members of its governing body (the individual defendants) for violations of the due process,

---

1. The TRPA, created pursuant to the Tahoe Regional Planning Compact, 94 Stat. 3233 (the Compact), between California and Nevada, Pub.L. No. 91–148, 83 Stat. 360 (1969), *amended*

equal protection and taking clauses. The district court granted summary judgment for defendants.

**Second Claim for Relief:** The SEZ plaintiffs seek damages from TRPA, Nevada, and California for violations of the taking clause. The district court dismissed as to Nevada and California on grounds of sovereign immunity and dismissed as to TRPA based on *Jacobson v. Tahoe Regional Planning Agency,* 566 F.2d 1353 (9th Cir.1977), *rev'd in part on other grounds sub nom. Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979).

**Third Claim for Relief:** The Class 1, 2, and 3 plaintiffs seek declaratory and injunctive relief against TRPA and the individual defendants for violations of the taking clause. The district court granted summary judgment for defendants on ripeness grounds.

**Fourth Claim for Relief:** The Class 1, 2, and 3 plaintiffs seek declaratory and injunctive relief against TRPA and the individual defendants for violations of the due process and equal protection clauses. The district court granted summary judgment for defendants.

**Fifth Claim for Relief:** The Class 1, 2, and 3 plaintiffs seek damages from TRPA, Nevada, and California for violations of the taking clause. The district court dismissed as to Nevada and California on grounds of sovereign immunity, and dismissed as to TRPA based on *Jacobson.*

**Sixth Claim for Relief:** All plaintiffs seek declaratory and injunctive relief, or in the alternative, damages from all defendants for deprivation of their rights to enjoy public improvements in violation of the due process, equal protection, contract, and taking clauses. The district court dismissed under *Furey v. City of Sacramento,* 592 F.Supp. 463 (E.D.Cal. 1984).

**Seventh Claim for Relief:** All plaintiffs seek injunctive relief and damages under section 1983 against all defendants based on the claims alleged above. The district court dismissed the claim for damages based on sovereign immunity as to California and Nevada, and dismissed as to TRPA based on *Jacobson,* and granted summary judgment with respect to the remaining claims.

## II. Mootness

On July 15, 1987, TRPA adopted a new Regional Plan that was markedly different from the 1984 Plan it replaced. TRPA, California, and Nevada argue that the adoption of the 1987 Plan rendered the plaintiffs' lawsuit moot, and cite cases in which challenges to regulations or statutes were rendered moot by repeal or substantial amendment of the offending provisions. *See, e.g., Bunker Ltd. Partnership v. United States (In re Bunker Ltd. Partnership),* 820 F.2d 308, 312–13 (9th Cir. 1987); *Aguirre v. S.S. Sohio Intrepid,* 801 F.2d 1185, 1189–91 (9th Cir.1986); *Bradley v. Judges of the Superior Court,* 531 F.2d 413, 418 (9th Cir.1976).

■ Insofar as the plaintiffs' taking claims are concerned, the defendants' arguments are foreclosed by *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), which held that " 'temporary' takings which ... deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation." *Id.* at 318, 107 S.Ct. at 2387. Thus, if Ordinance 81–5 or the 1984 Plan effected a taking, even for a short time, plaintiffs are entitled to just compensation for that temporary taking. Their claims for just compensation (Claims Two and Five, and portions of Claim Seven) are therefore not moot.

The defendants argue that the plaintiffs suffered no interim damages by reason of

Pub.L. 96–551, 94 Stat. 3233; Cal. Gov't Code §§ 66800–66801; Nev.Rev.Stat. §§ 277.190–.200,

is authorized to coordinate regional planning for the Lake Tahoe Basin.

the 1984 Plan because it was enjoined before it took effect.[2] However, this argument fails to show that the plaintiffs' claims are moot, for two reasons. First, it is an argument about *causation*. It may well be that TRPA cannot be blamed for any diminution of the value of the plaintiffs' land, but if true, that fact would show only that TRPA committed no "taking"; the plaintiffs' claims would be meritless, not *moot*. Second, the defendants' argument fails to address the full scope of the plaintiffs' claims. The plaintiffs claim damages dating from June 25, 1981, when Ordinance 81–5 was enacted. Even if we were to assume that all *post*-injunction damages were caused by the injunction rather than the Plan, the plaintiffs' claims for *pre*-injunction damages would be unaffected. Thus, the issuance of the preliminary injunction does not render the plaintiffs' claims moot.

■ Claim Six of the complaint requests compensation for assessments imposed on plaintiffs to finance public improvements that, because of the total ban on development of their lots, inured exclusively to the benefit of others. *See Furey v. City of Sacramento*, 780 F.2d 1448, 1455 (9th Cir. 1986) (where government imposes assessment on landowner to finance construction of public improvement, "the landowner must be given the opportunity to make beneficial use of the improvement or must be refunded the amount of the assessment"). While the plaintiffs may be able to develop their lots under the 1987 Plan, and thereby take advantage of the public improvements they have financed, that fact would not foreclose the possibility that

they may have suffered *Furey* injury by reason of the six-year moratorium on development. It is entirely possible, for example, that some of the assessments the plaintiffs paid were used to finance maintenance work or short-term projects, the benefits of which were entirely consumed during the moratorium period. Accordingly, Claim Six is not moot to the extent it seeks reimbursement for assessments paid to finance projects from which the plaintiffs could have derived no benefits even if they were to develop their property under the 1987 Plan.[3]

■ The claims for declaratory and injunctive relief are in a different category. It would be pointless to enjoin enforcement of a regional plan that is no longer in effect; claims for such relief have been rendered moot by adoption of the 1987 Plan. It would be equally pointless to render a declaratory judgment that the 1984 Plan is "null and void," as plaintiffs ask us to do in their claims seeking declaratory relief. Accordingly, the judgment below as to Claims One, Three, and Four (which request only equitable relief) is vacated. To the extent that Claims Six and Seven involve equitable relief, they are remanded with instructions to dismiss those portions of the complaint as moot. *See In re Bunker Ltd. Partnership*, 820 F.2d at 311 ("[w]here intervening legislation has settled a controversy involving only injunctive or declaratory relief, the controversy has become moot").

Resolution of the mootness issue eliminates the equitable claims against all defendants, and the plaintiffs do not challenge the district court's dismissal of the

---

**2.** On April 26, 1984, the same day TRPA adopted the 1984 Plan, the State of California brought suit against TRPA for declaratory and injunctive relief, arguing that the plan did not comply with the Tahoe Regional Planning Compact requirements. *California v. Tahoe Regional Planning Agency*, No. CIVS–84–0561 EJG (E.D.Cal.1984). On August 9, 1984, the district court granted California's request for a preliminary injunction, and issued an order which "enjoined and restrained [TRPA] from taking any action to approve any project ... or to approve the con-

struction of any man-made development within the agency's jurisdiction," with certain limited exceptions not relevant to this case. Order Granting Preliminary Injunction at 3. This order was affirmed on appeal. *California v. Tahoe Regional Planning Agency*, 766 F.2d 1308 (9th Cir.1985).

**3.** We address the merits of the district court's dismissal of Claim Six in Part V, *infra*.

claims for damages against Nevada and California. Thus, the plaintiffs are left with only the claims for damages against TRPA and the individual defendants (Claims Two and Five, and portions of Claims Six and Seven).

### III. Ripeness

The defendants point to several features of the 1984 Plan that provide potential relief from the prohibition on development of the plaintiffs' lots. Relying on *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), and *MacDonald, Sommer & Frates v. County of Yolo*, 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986), the defendants argue that the plaintiffs' claims are not ripe because they have not sought to avail themselves of these potential administrative remedies.

To evaluate the defendants' contentions, it is necessary to keep three relevant time periods in mind. First, there is the period from June 25, 1981 until August 28, 1983. During this time period, Ordinance 81–5 prohibited development of any Class 1, 2, or 3 lots and of any lots in SEZs. However, there was a limited exception on the Nevada side of the basin which permitted TRPA to approve construction of some single-family homes on Class 1, 2, and 3 lots. Second, there is the period from August 29, 1983 until April 26, 1984. During this period, the case-by-case approval system on the Nevada side had expired but the prohibition imposed by Ordinance 81–5 was still in effect. This amounted to a complete moratorium on development for approximately eight months. Finally, there is the period after April 26, 1984, when the 1984 Plan had been approved and was in effect (although a federal district court had enjoined TRPA from approving any projects under the Plan). With these time periods in mind, we address each of the defendants' contentions regarding ripeness.

### A. Amendment of the 1984 Plan

The defendants contend that the plaintiffs should have sought amendment of the 1984 Plan, because Article V(a) of the Compact requires TRPA to consider requests for amendment. We agree. The Compact specifically requires TRPA to act upon a property owner's request for a change in administrative policy within 180 days. *See* Compact Article V(a)(2), codified in Cal. Gov't Code § 66801 (TRPA must act "within 180 days after [the requested amendment] is accepted as complete according to standards which must be prescribed by ordinance of the agency"). This part of the Compact provides the plaintiffs with an opportunity to obtain administrative action regarding their plans for development, and offers the same possibility regarding development as does a system for requesting variances. Accordingly, we conclude that the plaintiffs were required to request that TRPA amend the Plan before they filed this action, and that their failure to do so renders unripe their taking claims for the period after April 26, 1984. *See Kinzli v. City of Santa Cruz*, 818 F.2d 1449, 1454 (9th Cir.1987) (claim for regulatory taking is not ripe until there is a final decision, which requires "(1) a rejected development plan, and (2) a denial of a variance"); *Herrington v. County of Sonoma*, 857 F.2d 567, 569–70, *amending* 834 F.2d 1488 (9th Cir.1988) (restating the *Kinzli* requirement but finding that it was excused in that case by the futility doctrine).

The requirement that landowners seek a variance before commencing a regulatory taking claim derives from the special necessity in such cases of determining exactly how much a land use regulation interferes with an individual's use of his property. *MacDonald, Sommer & Frates*, 477 U.S. at 348–49, 106 S.Ct. at 2565–66; *Williamson*, 473 U.S. at 190–91, 105 S.Ct. at 3118–19. Because a would-be plaintiff may escape economic injury entirely if he is granted a variance exempting him from some or all of the strictures written into an ordinance, his case is not ripe for adjudication until the governmental entity has denied at least one such request. A procedure for procuring an amendment to the regulation also presents the possibility that

a would-be plaintiff will be preserved from economic injury. The *means* differ, of course: an amendment changes the applicable regulation while a variance merely waives some or all of the regulation in its application to a specific person or class of persons. However, regardless of the means used, the fact remains that under either system, the taking that will occur "by default," *i.e.*, if the landowner seeks neither form of relief, can be avoided through positive action according to a statutorily prescribed procedure. Because either procedure can be utilized to mitigate or eliminate the disabilities imposed by local land regulations, we believe either must be pursued before a regulatory taking claim is ripe for judicial determination. In the words of the dissent, "Where such flexibility is built into a law, plaintiffs should first demonstrate that the law nevertheless does not accommodate their demands before they attack it as unconstitutional." *Post*, at 1344.

Crucial to our decision is the fact that TRPA specifically invites amendment proposals and promises action on them within a reasonable time. This case thus differs fundamentally from *Hall v. City of Santa Barbara*, 833 F.2d 1270 (9th Cir.1987), *cert. denied*, 485 U.S. 940, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988). The statute in *Hall* was a general rent-control ordinance, and the defendants argued that the plaintiff's claim was unripe because the ordinance could be repealed. We rejected this argument. We held that a taking claim is not precluded simply because a governing body *may*, under its general authority to act, amend applicable ordinances or statutes at some time in the future. 833 F.2d at 1277. Our holding merely reflected the basic principle that government action is not protected from judicial review by the mere possibility that the offending government body may someday of its own volition change its ways. Virtually all statutes are subject to repeal or amendment, yet they are not for that reason alone any less final, nor their effect any less certain. However, a statute that sets forth a specific procedure by which a person may seek to modify or ameliorate that statute's effect on him, and requires the governmental entity to act on his application within a reasonable time, presents an entirely different question. Here, the Compact expressly provides that TRPA *must* take action, within a finite and reasonable period, on any interested party's request for an amendment to the plan. We find nothing in the Compact that prevents property owners from using this amendment procedure to obtain the same results they could obtain by way of variance; thus, we are unable to draw any distinction between the two forms of relief that is not purely formal.[4] In short, we are compelled to conclude that a plaintiff's failure to utilize such a system, barring futility, will make his claims unripe.

In arguing that the specific provisions of Article V(a) of the Compact do not require property owners to seek available administrative relief before challenging the constitutionality of the Regional Plan, the dissent fails to give any practical effect to that article. The dissent remarks, somewhat disingenuously, that "[c]itizens don't need the government's permission to petition for a change in the law," *post*, at 1346, but this epigram misses the point. Although Article V(a) does not—and certainly *ought* not —"guarantee that amendments proposed via this special procedure are to be given *substantively favored* treatment," *post*, at 1346 (emphasis added), the provision does require that the complaints of aggrieved landowners be addressed, and that action— favorable or unfavorable—be completed no

---

**4.** The dissent asserts that in *Herrington*, "we recognized the distinction between variances and amendments." *Post*, at 1345. It points out that the Herringtons' claims were not rendered unripe by the fact that an amendment to Sonoma County's General Plan was available to them. However, the basis for that conclusion was that an application for such an amendment would have been futile in the Herringtons' case. 857 F.2d at 569–70. Especially in view of the fact that we also excused the Herringtons' failure to request a *variance* on the ground that a *variance* application would also have been futile, there is simply no basis for asserting that *Herrington* requires us to treat amendments and variances differently for ripeness purposes.

later than six months after the proposed amendments are lodged with TRPA. Article V(a) thus provides an adversely affected citizen with an effective means of submitting a specific course of conduct to TRPA and forcing TRPA to act on his submission.

We would be among the last to deny that the constitutionally protected right to petition for redress of grievances is an important liberty, but we intend no disparagement when we observe that the right to present one's views in a letter to an elected official carries with it no means of inducing that official or anyone else in the government to act on any specific measure. The constitutional privilege simply bears little resemblance to the statutory right granted by Article V(a), and the dissent errs seriously in suggesting that the more specific right "makes not the least bit of difference" and fails to "provide anything of substance," *post*, at 1346. TRPA's procedure guarantees disappointed citizens more than the opportunity to make public suggestions that laws be amended or repealed; it guarantees them that the Agency will act upon their proposal and do so within six months. Given the complexities of land use planning, and particularly the interrelatedness of each proposed use with each other use, this period does not seem unreasonably long to us.[5] While we agree with the Supreme Court that property owners need not "resort to piecemeal litigation or otherwise unfair procedures," *MacDonald, Sommer & Frates*, 477 U.S. at 350 n. 7, 106 S.Ct. at 2567 n. 7; *see also Kinzli*, 818 F.2d at 1455; the procedure at issue here places no such burdens on the plaintiffs.

Finally, we simply do not understand why the dissent would have us distinguish variances from amendment requests on the ground that one is administrative while the other is political. For one thing, we cannot see what makes the process governed by Article V(a) political rather than administrative. TRPA's amendment procedure, like the hypothetical variance procedure supposed by the dissent, is "defined by the challenged law itself" and is, "by [its] nature, finite." *Post*, at 1345. Moreover, the Compact sets forth certain limitations on the permissible content of the Regional Plan, and we see no reason not to equate these limitations with "guidelines for what variances are permissible." *Id.* Conversely, if a political body is one that "needs no ascertainable reason at all for changing course [and] is constrained only by the Constitution and the principles of political accountability," *post*, at 1345, then TRPA does not seem to qualify.

In any event, the dissent's attempt to distinguish variances from amendments appears to be based on a fundamental misconception of the process by which such decisions are made. The dissent seems to believe that variances are the province of bureaucrats with green eye-shades who, based solely on the principles of engineering or mathematics, apply slide-rules to citizens' requests; while amendments are considered by Machiavellian politicians who are concerned principally with issuing political decisions that will advance their careers. That is simply not the case. Variance applications frequently raise controversial political questions which engender substantial community division and debate;

---

5. Obviously a procedure designed to keep aggrieved landowners on ice *indefinitely,* or for longer than the government could reasonably require in order to reach a final decision under the circumstances, would present a different question. Requiring the plaintiffs to give the government one last chance before filing a regulatory taking suit in federal court will postpone the potential vindication of their rights by somewhat less than other state procedures that plaintiffs are unquestionably required to exhaust before they sue. *See, e.g., Sinaloa Lake Owners Association v. City of Simi Valley,* 882 F.2d 1398,

1403 (9th Cir.1989) (*per* Kozinski, J.), *cert. denied,* —— U.S. ——, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990).

Likewise, we have no occasion to accept the dissent's darkly worded invitation to "consider what other constitutional claims can thus be shunted away from the courts and into the political arena, and for how long." *Post,* at 1346. Suffice it to say that even the framers of the fifth amendment saw the wisdom of enumerating life, liberty, and property separately, and that few of us would put equal value on the first and the third.

ultimately, many are decided on broad policy grounds. Moreover, such decisions may well be made by the very same legislators who act on proposals to amend zoning legislation. For example, in the City of Los Angeles, the loser in a zoning variance battle has the right to appeal the decision to the City Council, where the fifteen elected members of that body make the final decision, subject only to the Mayor's right to veto their action. Los Angeles Municipal Code §§ 12.27–12.28. Thus, the distinction relied on by the dissent simply does not exist.

The more fundamental legal problem with the proposed distinction is that it finds no support in the concept of ripeness. The doctrine that a regulatory taking claim "is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue," *Williamson*, 473 U.S. at 186, 105 S.Ct. at 3116, has nothing to do with the character of the government entity involved. The question is rather the character of the *decision*, and although the finality of the decision depends in part upon the nature of the process by which it may be changed, we must evaluate that process by examining its actual features, not merely by calling it either political or administrative. Certainly as long as the process is limited and reasonably short in duration, and is guaranteed to culminate in either a "yes" or a "no," we believe the plaintiffs are required to pursue it. Because the plaintiffs here failed to request an appropriate amendment, their claims are not ripe insofar as they concern any temporary taking that may have occurred after the enactment of the 1984 Plan on April 26, 1984.[6]

### B. The Case–by–Case Exception to Ordinance 81–5

■ Under Ordinance 81–5, an interim prohibition was placed on any development of Class 1, 2, or 3 land after June 25, 1981, but a case-by-case system for approving construction of single-family homes in these areas was in effect on the Nevada side of the Tahoe basin until August 28, 1983. Again, the Class 1, 2, and 3 plaintiffs, all of whom own land on the Nevada side of the basin, do not allege that any of them attempted to take advantage of this system. Therefore, the claims of the Class 1, 2, and 3 plaintiffs for the period from June 25, 1981, through August 28, 1983, are also unripe. In effect, then, these plaintiffs are left with a facial challenge to an eight-month moratorium on development from August 29, 1983 until the adoption of the 1984 Plan on April 26, 1984. However, the situation of the SEZ plaintiffs is quite different. Ordinance 81–5 did not permit any construction in SEZs, and there was no provision for case-by-case exceptions to this prohibition. Because there was no way for the SEZ plaintiffs to apply for building permits, their claims survive this ripeness challenge.

The defendants argue that they cannot be held liable for imposition of a temporary moratorium for a reasonable period of time during which they were diligently drafting a new land use plan. We need not determine the continuing availability of this defense after *First English*. In any event, the reasonableness of the delay and the diligence of the government's efforts are clearly questions of fact that cannot be resolved at this point in the proceedings. Accordingly, the existence of the case-by-case exception renders Claims Five and Seven unripe only in the case of the Class 1, 2, and 3 plaintiffs, and only to the extent that they seek damages for the period before August 28, 1983.

### C. Land Classification Challenges

■ The defendants also argue that the plaintiffs' claims are unripe because they failed to challenge the land capability classifications of their properties in the manner

---

**6.** The defendants also argue that the plaintiffs' claims are unripe because of the availability of transfer of development rights ("TDRs") under the 1984 Plan. In view of our conclusion that the plaintiffs' taking claims for the period after the effective date of the 1984 Plan are unripe, we need not decide the merits of this contention.

provided by Ordinance 81–5. The Ordinance permits any interested person to challenge a land capability district classification. The plaintiffs contend that they have always conceded that their land capability districts (and thus their properties) were correctly classified under TRPA's classification scheme, and that they therefore have no basis for seeking reconsideration of TRPA's decisions.

The defendants point to language in the complaint and in two of the plaintiffs' affidavits criticizing the accuracy of the classification scheme, known as the "Bailey System." However, reading these criticisms in context, we think it fair to conclude that the plaintiffs allege only that the Bailey System is overbroad, and thus deficient, insofar as it serves as a basis for the prohibitions imposed by TRPA in the 1981 ordinance. They argue that because the Bailey System classifies large areas containing many lots, it does not reflect the characteristics of a particular lot accurately enough to justify a prohibition on development of that lot. Hence, the plaintiffs challenge only the reasonableness of using the Bailey System to prohibit development on particular lots without any on-site inspection of the lots in question; they do not challenge the accuracy of TRPA's application of the Bailey System to any particular land capability districts or the lots situated therein. Consequently, it would serve no purpose to require the plaintiffs to challenge the individual classifications of their properties, classifications with which they have no disagreement. *See Whitney Benefits, Inc. v. United States,* 752 F.2d 1554, 1558 (Fed.Cir.1985) ("the exhaustion doctrine does not require [the plaintiffs] to do anything so absurd as to pursue to the bitter end … an attack on a state decision denying them a permit to mine, which decision they believe to have been correct").

■ Although this interpretation of the plaintiffs' allegations adequately explains why they had no duty to use the reclassification provisions of Ordinance 81–5, it raises an additional question: whether the plaintiffs were required to propose an amendment to the plan that preceded the 1984 Plan,[7] either refining or abolishing the Bailey System. Arguably, the plaintiffs' dissatisfaction was as much with the Bailey System itself as with the prohibitions of Ordinance 81–5;[8] in line with our discussion in Part III.A *supra,* one could conclude that the plaintiffs were obliged to propose an amendment to the 1971 Plan before challenging the Bailey System in court.

However, we need not resolve this issue, because we believe that offering a proposed amendment during a time when TRPA was in the process of drafting a new plan would have been futile. Whether the plaintiffs were injured by the Bailey System itself or only by the prohibitions contained in Ordinance 81–5 (which were based on the classifications made under the Bailey System), it is certain that they were not injured at all until Ordinance 81–5 went into effect on June 25, 1981. From that time until the 1984 Plan was adopted (after which date the plaintiffs' claims were unripe for other reasons, as we have already held), TRPA was trying to resolve the very issues to which any proposed amendment would have been addressed. No purpose would have been served by asking TRPA to decide those questions earlier than it did. We believe the plaintiffs were entitled to allow TRPA to present its first draft for public discussion before attempting to improve upon TRPA's work.

---

7. The Bailey System was apparently not adopted until 1974, and thus could not have been in the original version of the 1971 Plan, which was still in use in 1980. The record does not show whether the Bailey System was later incorporated into the 1971 Plan, but we assume for the purposes of our discussion that it was, and that it would therefore be possible to reform the Bailey System by amending that Plan.

8. If the dissatisfaction related to the ordinance, there would be no need to request an amendment prior to filing an action. The amendment requirement stems from Article V(a) of the 1980 Compact, providing for amendment of plans. There is no comparable provision with respect to amendment of ordinances.

### D. "Buyout" Programs

■ The defendants' final contention is that the plaintiffs' claims are unripe because the United States, California, and Nevada have each instituted "buyout" programs to purchase certain environmentally sensitive lots in the Lake Tahoe area. We fail to see how any of these programs make the effect of TRPA's actions any less certain. First, the California program is simply irrelevant because it makes no provision for the purchase of any of the properties at issue in this case, all of which are located in Nevada. Second, the Nevada program was not enacted until after the plaintiffs filed their lawsuit—indeed, after the district court disposed of the plaintiffs' claims. Those claims were therefore ripe when filed.[9] Finally, the federal buyout program, which *was* in existence during the relevant time period and which could conceivably result in some of the plaintiffs' properties being purchased, is administered by an entirely different sovereign; it is not "compensation" (just or otherwise), either from TRPA or from either of the states that are parties to the Compact. The plaintiffs' remaining claims are therefore not rendered unripe by the existence of these buyout programs.

### IV. TRPA's Immunity

■ The district court held, under the authority of *Jacobson v. Tahoe Regional Planning Agency*, 566 F.2d 1353, 1358 & n. 7 (9th Cir.1977), *rev'd in part on other grounds sub nom. Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979), that TRPA was immune from monetary liability for inverse condemnation. *See Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 611 F.Supp. 110, 116–17 (D.Nev.1985). In *Jacobson* we reasoned that "TRPA was given only the power to regulate, not the power to condemn," *id.* at 1358 n. 7, and therefore could not be liable in damages

for inverse condemnation. This reasoning is at odds with *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), wherein the Court stated: "While the typical taking occurs when the government acts to condemn property in the exercise of its power of eminent domain, the entire doctrine of inverse condemnation is predicated on the proposition that a taking may occur without such formal proceedings." *Id.* at 316, 107 S.Ct. at 2386. As the Court held, even a temporary regulation of land may result in a substantial burden to landowners, and "[w]here this burden results from governmental action that amounted to a taking, the Just Compensation Clause of the Fifth Amendment requires that the government pay the landowner for the value of the use of the land during this period. Invalidation of the ordinance ... is not a sufficient remedy to meet the demands of the Just Compensation Clause." *Id.* at 319, 107 S.Ct. at 2388 (citation omitted).

*First English* does not squarely overrule *Jacobson*, because the defendant in *First English*, unlike TRPA, did in fact possess the power of condemnation; it merely chose not to exercise it. Any attempt to rely on this distinction would, however, unavoidably conflict with the reasoning of *First English*: Governments cannot avoid the strictures of the Constitution through the expedient of delegating regulatory powers, but not the power of eminent domain, to independent government entities that would then be free to zone away all use of private property without fear of liability. As the Court observed, "[I]t is the Constitution that dictates the remedy for interference with property rights amounting to a taking." 482 U.S. at 316 n. 9, 107 S.Ct. at 2386 n. 9. After *First English*, any government entity that regulates away all economically viable use of property must be prepared to pay just compensation. We therefore reverse the district court's dismissal on immunity grounds

---

9. We express no view of the effect this subsequently enacted statute may have upon the merits of the plaintiffs' case.

(as against TRPA only) of the ripe portions of Claims Two and Five, and, to the extent they request damages against TRPA, the ripe portions of Claims Six and Seven.

## V. The District Court's Dismissal of Claim Six

■ The district court dismissed Claim Six on the authority of the lower court opinion in *Furey v. City of Sacramento*, 592 F.Supp. 463 (E.D.Cal.1984), *aff'd*, 780 F.2d 1448 (9th Cir.1986). The court reasoned that Claim Six seeks to recover both the benefit of use of the improvements and the actual amount of the assessments paid, and that these are merely two of the "sticks" making up the "bundle of rights" that property ownership comprises. Since it viewed Claim Six as "merely an attempt to subdivide the property rights of plaintiffs" and obtain double compensation, the court granted the defendants' motion to dismiss. *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 611 F.Supp. 110, 118 (D.Nev.1985).

Our holding in *Furey* is at cross-purposes with the district court's conclusion here. While we indicated that the ability to use public improvements financed by assessments is one of the attributes of property ownership that cannot be isolated from the property itself for purposes of a taking claim, 780 F.2d at 1453–54 n. 4, we held that landowners could state a claim for reimbursement of assessments independent of any claim for taking of the land itself. *Id.* at 1453–54 n. 4, 1455. Under *Furey*, therefore, we must reverse the district court's dismissal of Claim Six.

■ However, although *Furey* allows recovery under circumstances such as those alleged here, it also suggests that any recovery of assessments should be from the party that controls the assessment fund, rather than from the government entity that enacted the zoning ordinance that caused the alleged taking.

Plaintiffs do not specify in their complaint who collected the assessments. They do, however, allege that "[a] significant portion of the expenses of [the public works projects] was funded by assessments against private properties in the Lake Tahoe Basin levied pursuant to applicable laws of [Nevada and California]." If TRPA collected assessments, the appropriate remedy would lie with that entity. If, on the other hand, some other entity was responsible for collecting the assessments, then it would be inappropriate to require TRPA to provide the refund. We therefore reinstate Claim Six only to the extent that it seeks reimbursement for assessments actually paid by the plaintiffs to TRPA.[10] If some other government body collected the assessments, then on remand the plaintiffs may seek leave to amend their complaint to name the appropriate entity.[11]

## VI. Conclusion

As to:

**Claims One, Three, and Four:** The district court's rulings are vacated and the district court is instructed to dismiss them as moot.

**Claim Two:** The district court's dismissal of the claim against TRPA is reversed with respect to the period before April 26, 1984; the district court's dismissal with respect to the remainder of this claim is affirmed.

**Claim Five:** The district court's dismissal of the claim against TRPA is reversed with respect to the period after August 29, 1983 and before April 26, 1984; the dismissal of the remainder of this claim is affirmed.

**Claim Six:** The district court's dismissal is reversed with respect to assessments actually paid by the plaintiffs to TRPA in order to finance projects and expenditures from which the plaintiffs could derive no benefit even if they were to develop their

---

10. Of course, any compensation the plaintiffs receive on their taking claim would have to be offset by any reimbursement they receive under *Furey*.

11. We express no view on any of the possible statute of limitations issues that might be raised.

property under the 1987 Plan. The district court's rulings with respect to the remainder of the claim are vacated and the district court is instructed to dismiss those portions as moot.

**Claim Seven:** The district court's dismissal of the plaintiffs' claim against TRPA for damages accruing after April 26, 1984 is affirmed; the district court's dismissal of the Class 1, 2, and 3 plaintiffs' claim against TRPA for damages accruing prior to August 29, 1983 is affirmed; and the district court's dismissal of the remaining portions of the claim seeking damages against TRPA is reversed. The district court's rulings with respect to the remainder of the claim are vacated and the district court is instructed to dismiss those portions as moot.

FLETCHER, Circuit Judge, special concurrence:

I specially concur in the majority opinion. I am in full agreement except for the rationale it adopts in section III.A to deny damages in the period *post* April 26, 1984 and its conclusion in section II on the importance to this case of a court injunction against TRPA in other litigation. Since I conclude plaintiffs have stated no claim for which relief can be granted, I would not reach the ripeness issue. Because court orders prevented the 1984 Plan from going into effect, plaintiffs cannot state or prove that the Plan caused them injury.

The effective date of the Plan was April 26, 1984. The State of California and the League to Save Lake Tahoe sued TRPA on April 26 and 27, 1984, in the United States District Court for the Eastern District of California. A scant few days later, on May 1, the court issued a temporary restraining order prohibiting TRPA from taking any action to approve building projects and ordered TRPA to show cause why a preliminary injunction should not issue. Order to Show Cause and Temporary Restraining Order at 3, *California v. Tahoe Regional Planning Agency*, No. CIV. S–84–0561

EJG (E.D.Cal. May 1, 1984).[1] The order initially was to expire on May 31 but was extended until June 11. Order Granting Preliminary Injunction at 2 (Aug. 9, 1984). On June 11, the court held a hearing on the order to show cause. By memorandum decision dated June 15, the court granted a preliminary injunction containing the same restrictions as the TRO and extending the TRO until the court's formal order granting the injunction could be issued. Memorandum of Decision (June 15, 1984); Order Granting Preliminary Injunction at 2. The court's subsequent August 9 order granting the injunction contained the same restrictions as the TRO and June 15 memorandum decision: TRPA was enjoined from taking any action to approve any construction project.

The TRO and injunction, not the Plan, prevented the plaintiffs from building on their property. The TRO and the injunction forbade even the limited development allowed under the Plan. The plaintiffs claim that TRPA's wrongdoing leading to the injunction should not protect it from liability here. However, the court granted the injunction based on California's and the League's claim that the Plan was not restrictive enough: it would permit construction of single-family residences in excess of Compact limits and inflict environmental damage, and the Plan also did not abide by the Compact's stricter procedural requirements for project approval. *California v. Tahoe Regional Planning Agency*, 766 F.2d 1308, 1312 (1985). TRPA's error was not that claimed by plaintiffs here, that is, being too restrictive, but was instead being too lenient. In short, the "wrongdoing" plaintiffs claim here was not the "wrongdoing" that triggered the injunction.

Because the court imposed the moratorium, TRPA's adoption of the 1984 Regional Plan was not an actionable cause of plaintiffs' claimed injury. The TRO issued only

---

**1.** In this and subsequent orders, the court made an exception for "circumstances of imminent threat to public health, safety and welfare." Order to Show Cause and Temporary Restraining Order at 3.

five days after the Plan's effective date, effectively preventing the 1984 Plan from ever being implemented. Amendment of the Plan to meet the California court's objections would *not* have freed the lots for development.[2] The esoteric distinctions between plan amendments and variances, and between quasi-judicial and legislative actions of local governmental bodies, can and should be avoided in this case.[3] I would affirm simply on the basis I have indicated.

KOZINSKI, Circuit Judge, dissenting [*] in part:

I join all but section III.A. of the per curiam opinion. That section equates a request for amendment with a request for a variance, and concludes that plaintiffs' taking claim for the post–1984 period is not ripe because plaintiffs did not request an amendment to the Plan. This notion is contrary to prior case law and overlooks a fundamental distinction between variances and amendments.

I

In the regulatory area, not all deprivations of property amount to a taking; compensation is required for only those deprivations that go "too far" and have the same effect as an appropriation of the property through eminent domain or physical possession. *See Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 199, 105 S.Ct. 3108, 3123, 87 L.Ed.2d 126 (1985); *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). It is therefore critical that a reviewing court know precisely what depri-

vation a regulation has created. "A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." *MacDonald, Sommer & Frates v. County of Yolo,* 477 U.S. 340, 348, 106 S.Ct. 2561, 2565, 91 L.Ed.2d 285 (1986). Knowing how far the regulation goes requires that "the government entity charged with implementing the regulations [have] reached a final decision regarding the application of the regulations to the property at issue." *Williamson,* 473 U.S. at 186, 105 S.Ct. at 3116.

Where the regulation or ordinance in question allows for variances, a "final decision" requires that the agency charged with implementing the law have turned down at least one request for a variance. *See, e.g., Williamson,* 473 U.S. at 188–89, 193–94, 105 S.Ct. at 3117–18, 3120; *Kinzli v. City of Santa Cruz,* 818 F.2d 1449, 1454, amended 830 F.2d 968 (9th Cir.1987); *Herrington v. County of Sonoma,* 834 F.2d 1488, amended 857 F.2d 567, 569–70 (9th Cir.1988). This rule makes some sense. A variance is a means by which a land use regulation can be tailored to meet individual needs. Where such flexibility is built into a law, plaintiffs should first demonstrate that the law nevertheless does not accommodate their demands before they attack it as unconstitutional.

II

The per curiam opinion would extend the variance rule beyond its sensible bounds, by requiring plaintiffs to have asked the TRPA to amend the Plan before coming to court. This extension is at odds with both our prior case law and common sense.

---

2. Although there were a few days between April 26, when the Plan took effect, and May 1, when the temporary restraining order took effect, the plaintiffs cannot claim that they could have completed all the necessary prerequisites to building, including getting a TRPA permit, within those few days.

3. If I were to address the "ripeness" issue, I simply would hold that transfer of the plaintiffs' development rights granted under the 1984 Plan was a prerequisite to any claim against TRPA, rendering any claim unripe. *See* majority opin-

ion, p. 1339 n. 6. Lack of causation makes it unnecessary for me to do so.

* Although, in the time-honored tradition, this is styled a dissent, it is more in the nature of a disagreement. Because section III.A of the per curiam opinion commands only one vote, it is *not, of course, a holding of this court.* Nevertheless, since two members of the panel find it necessary to reach the issue of whether plaintiffs' post–1984 claim is ripe, it is appropriate to set forth our disagreement regarding how that issue should be resolved.

A. In *Hall v. City of Santa Barbara*, 833 F.2d 1270, 1277 (9th Cir.1987), we held that a taking claim is not precluded because a governing body may amend applicable laws at some time in the future. "A governmental taking can always be undone if the government so chooses. That has never defeated a taking claim." Id (citing several examples).

In *Herrington v. County of Sonoma*, 834 F.2d 1488, amended at 857 F.2d 567 (9th Cir.1988), we recognized the distinction between variances and amendments. In that case, the Herringtons did not request a variance from the county. Nonetheless, we held that this failure did not render their taking claim unripe because, under California law, the variance they needed couldn't have been granted anyway. 857 F.2d at 569–70. A variance request was therefore not required, and the Herringtons met the finality requirement because "the *only* means of obtaining approval of [their] proposal was through a General Plan amendment." Id. at 570 (emphasis original).[1] We imposed no additional requirement that the Herringtons attempt to have the plan amended. Yet the per curiam opinion would do precisely this—and create a square conflict with our prior decisions in *Hall* and *Herrington*.

B. The per curiam opinion seeks to distinguish *Hall* based on the fact that the Compact here allows land owners to ask for amendments and requires action by the TRPA within 180 days. *See* per curiam op at 1337–1338; Compact Article V(a)(2). The per curiam opinion perceives no difference between the amendment procedure and the variance procedure. However, a difference there is, and it is fundamental.

A decision denying a variance is final, whereas a decision not to amend a law never is. This is because a request for an amendment is directed to a wholly different process than a request for a variance. A variance may be granted or denied according to an administrative process defined by the challenged law itself. Administrative processes are, by their nature, finite; so long as the governing ordinance or regulation remains unchanged, denial of a variance acts as a bar to further requests of the same type. Moreover, the governing law sets guidelines for what variances are permissible. It is therefore possible for the government entity charged with implementing the regulation to give plaintiffs a "final decision" as to whether their desired land use will be allowed under existing law. Indeed, when it is clear that the governing law does not permit the kind of variance plaintiffs need, they needn't even ask. *Herrington*, 857 F.2d at 569–70.

An amendment, on the other hand, requires an exercise of political judgment. Political processes are, by their nature, infinite. A change in the makeup of the legislative body, a shift in the political winds, or even a change in attitude based on further experience or additional wisdom, may be a sufficient reason for a political body to change its mind. In fact, a political body needs no ascertainable reason at all for changing course; it is constrained only by the Constitution and the principles of political accountability. There is thus no way for a court to say that a legislative process

---

1. The per curiam's attempt to torture the holdings in *Kinzli* and *Herrington* into supporting its position, per curiam op at 1337, does not survive a careful review of those cases. The error lies in a failure to recognize that when *Kinzli* (and *Herrington* by incorporation) require the landowner to have submitted a "development plan," they are merely saying that the owner must tell the planning board what he would like to do with his property. This has nothing to do with requesting that the governing law be amended.

The per curiam opinion reaches a conclusion by sleight of hand: "Especially in view of the fact that we also excused the Herringtons' failure to request a variance on the ground that a variance application would also have been futile, there is simply no basis for asserting that *Herrington* requires us to treat amendments and variances differently for ripeness purposes." Id. (emphasis omitted). But this is precisely the contrary of what *Herrington* says. What we held in *Herrington* is that once it is clear that the proposed development plan does not fit within the governing law, the owner has exhausted and need not go the next step of asking for a change in the law. Far from treating variances and amendments as equivalent, *Herrington* treated them as antithetical.

has come to rest with respect to a challenged law.[2]

The per curiam opinion suggests that a court could excuse further amendment requests on the theory that such requests would be futile. *See* per curiam op at 1337 (stating that "barring futility," a plaintiff's failure to utilize the amendment procedure renders his claim unripe). But how does one determine futility? Is it ever possible to say that a political institution will fail to change its mind about an amendment that it has already rejected? Are courts even competent to render such a judgment? To require plaintiffs to demonstrate that a governing body has made a final decision about what amendments it will allow is to preclude judicial review altogether, as each day brings a new opportunity for the legislature, in its wisdom, to change the law.[3]

It makes not the least bit of difference that the Compact here establishes a formalized procedure for proposing amendments. Citizens don't need the government's permission to petition for a change in the law. That right is already guaranteed by the Constitution. *See* U.S. Const., Amend. I.

Nor does the "requirement" that the TRPA act within 180 days provide anything of substance. For one thing, it is entirely hortatory; a political body cannot bind itself to take political action within a specific time frame. Failure to act within 180 days is plainly not judicially reviewable. Thus, the characterization of the statute as "an effective means of submitting a specific course of conduct to TRPA and forcing TRPA to act," per curiam op at 1337, sounds reassuring, but what does it mean?

Although the per curiam opinion talks confidently about how landowners are given a means of "forcing the TRPA to act," it does not explain just how landowners would go about doing such forcing if the TRPA chose not to act.

In any event, I don't see how the 180-day requirement distinguishes this case from *Hall* and *Herrington*. That the TRPA has given some assurance that it will consider and dispose of amendment requests promptly makes it no more likely that it will act on them favorably. Absent a guarantee that amendments proposed via this special procedure are to be given substantively favored treatment, there is no distinction whatever between amendments proposed according to this procedure and those considered under the more traditional rough-and-tumble processes employed by most legislative bodies.

The per curiam opinion thus would allow procedure to triumph over substance: By providing a meaningless mechanism for petitioning for legislative change, the TRPA would be able to delay or even preclude substantive judicial review of plaintiffs' constitutional claim. We should probably pause to consider what other constitutional claims can thus be shunted away from the courts and into the political arena, and for how long.

The rejoinder that life is more important than property, per curiam op at 1338 n. 5, obscures the fact that both are protected by the Bill of Rights and for that reason alone deserve solicitude—rather than thinly disguised contempt—from members of the

2. Granted, at the local government level the distinction between legislative and administrative action is not as clear-cut as at the state or federal level. But, the per curiam's trivialization of the issue notwithstanding, the distinction has very significant consequences. For example, when the members of a local governing body act legislatively, they are entitled to absolute immunity, *Lake Country Estates, Inc. v. TRPA*, 440 U.S. 391, 394, 406, 99 S.Ct. 1171, 1173, 1179, 59 L.Ed.2d 401 (1979) (holding that to the extent that members of the TRPA acted legislatively in adopting a land use ordinance, they were entitled to absolute immunity). When they act administratively, however, they are only entitled to qualified immunity. *Cinevision Corp. v. City of Burbank,* 745 F.2d 560,

577–78, 580 (9th Cir.1984). By suggesting that it's all the same ball of wax, we would not only deny a distinction we have held relevant in prior cases, but also undermine the absolute immunity heretofore enjoyed by local government officials acting in a legislative capacity.

3. Perhaps the per curiam opinion is suggesting that only one request for amendment is required. But what's the principled basis for stopping there? Having once failed to persuade a legislative body to adopt a desired amendment, a landowner will still be faced with the possibility that the next attempt will be successful. When is enough, enough?

judiciary. The fact is, the Constitution protects a variety of rights and liberties and reasonable minds might differ as to the relative importance of each. When we relegate certain of these to collateral status by refusing to give them the full measure of constitutional protection, we undermine the integrity of the constitutional structure and hand a potent weapon to those who may not share our vision as to which rights trump which.