Alice W. CARPENTER, Plaintiff,

v.

**TAHOE REGIONAL PLANNING AGENCY, et al., Defendants.**

No. CV–N–90–115–ECR.

United States District Court, D. Nevada.

Aug. 31, 1992.

Randall M. Faccinto, Hoffman, Lien & Faccinto, Tahoe City, Cal., for plaintiff.

Gary A. Owen, J. Thomas Susich, Crowell, Susich, Owen & Tackes, Carson City, Nev., for defendants.

## ORDER

EDWARD C. REED, Jr., Senior District Judge.

Before the court is Defendant Tahoe Regional Planning Agency's ("TRPA's") motion for summary judgment (document # 14). The motion was renewed pursuant to court order by Defendant's renewed motion for summary judgment (document # 31). The court has also read and considered Plaintiff's oppositions to the motions (documents # 23 & # 35) and heard oral argument on the motion for summary judgment on August 25, 1992. Additionally, the court invited supplemental briefs from the parties pursuant to its Minute Order of April 14, 1992 (document # 37) and the parties have since offered the same (see documents # 38, # 39 & # 41).[1] This matter is now ripe for the court's decision.

---

1. The parties' supplemental briefs concerned the effect, if any, that the Supreme Court's recent decision in *Lucas v. South Carolina Coastal Council,* —— U.S. ——, 112 S.Ct. 2886, 120

## BACKGROUND AND HISTORY

This court has had many opportunities to outline the history and significance of the Tahoe Regional Planning Agency, the 1969 Compact that created TRPA, and the subsequent compact and Regional Plans promulgated by TRPA.[2] The court needs not set out that history again here in detail. However, a brief chronology and statement of facts will help the reader understand the discussion contained in this order.

TRPA was created in 1969 pursuant to the Tahoe Regional Planning Compact adopted by the states of California and Nevada under the authority of Congress (the "1969 Compact"). Pub.L. No. 91–148, 83 Stat. 360 (1969); Cal.Gov't Code §§ 66800–66801; NRS §§ 277.190–277.200. The 1969 Compact authorized TRPA to coordinate regional planning for the Lake Tahoe Basin area. However, after TRPA determined that the 1969 Compact was inadequate to protect the region from environmental harm, the two states agreed to a new compact in 1980 (the "1980 Compact"). Pub.L. 96–551, 94 Stat. 3233 (1980). The new compact attempted to establish "environmental carrying capacities" while providing for orderly and environmentally safe growth.

The 1980 Compact included Ordinance 81–5, an attempt, according to TRPA, to rescue the basin from pollution, over-development, and the loss of environmentally high-risk lands to development. At the time, thousands of undeveloped, single-family residential lots existed in the basin. Ordinance 81–5 created a case-by-case review process through which land owners were required to navigate in order to receive single-family dwelling building permits. TRPA wished to keep the level of approved construction sites at a number that the Agency considered to be environmentally safe for the region.

Plaintiff had purchased her land in 1973 but did not record the deed until 1980. It was not until 1981 that Plaintiff decided that she wished to build a home on the land. By then, Ord. 81–5 and the entire 1980 Compact were in effect. On May 3, 1982, Plaintiff therefore submitted an application for a building permit for a single-family dwelling pursuant to the case-by-case review system established under Ord. 81–5.

On August 26, 1983 the TRPA governing board temporarily suspended issuance of all permits for all projects including those which could be approved under Ord. 81–5. Believing that the board did not have the legal authority to permit any development in the Basin prior to the adoption of a regional plan under the 1980 Compact, TRPA decided to place a moratorium on new development permits. The board provided that once the moratorium was lifted, those permits pending at the time of the moratorium would be given first priority.

In 1984 TRPA passed its 1984 Regional Plan ("1984 Plan"). The 1984 Plan provided for construction of only 75 residences per year on the Nevada side of the Basin on Land Capability District 1, 2 and 3 lots—the three most environmentally sensitive classifications.[3] However, the 1984 Plan also provided that those applications pending prior to the eight month moratorium would be considered first. The 1984 Plan also created a single-family residential lot evaluation system and prescribed an elaborate system of transfer of development rights to environmentally sensitive

---

L.Ed.2d 798 (1992) should have upon the present controversy. This court feels that *Lucas* does not touch upon the issues presented by the instant case as *Lucas* dealt with a fact-specific exception to the ripeness doctrine and the subject of the "noxious use" exception to taking clause problems.

**2.** See *Schultz v. Tahoe Regional Planning Agency,* No. CV–R–81–259–ECR, slip op. at 2–4 (D.Nev. Aug. 31, 1989); *Stephans v. Tahoe Regional Planning Agency,* 697 F.Supp. 1149, 1151 (D.Nev.1988); *Sederquist v. Tahoe Regional*

*Planning Agency,* 652 F.Supp. 341, 342–43 (D.Nev.1987); *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,* 638 F.Supp. 126, 128–29 (D.Nev.1986), *vacated in part,* 911 F.2d 1331 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1404, 113 L.Ed.2d 459 (1991). See also *People of State of Cal. ex rel. Van De Kamp v. Tahoe Regional Planning Agency,* 766 F.2d 1308, 1310–11 (9th Cir.1985).

**3.** Plaintiff's lot was designated Class 1—the most environmentally sensitive.

parcels like Plaintiff's. It also allowed land holders to challenge their land capability classifications.

The 1984 Plan never took effect. The day that it was adopted the Attorney General of California filed suit alleging that the 1984 Plan violated the 1980 Compact. The suit requested a temporary restraining order and preliminary injunction to prohibit enforcement of the 1984 Plan. The United States District Court for the Eastern District of California issued the restraining order and subsequently the injunction and prohibited TRPA from granting *any* development or building permit. Eventually the preliminary injunction was lifted on July 15, 1987 when the two parties to the suit agreed to a settlement which eventually became TRPA's 1987 Regional Plan ("1987 Plan").

Among other things, the 1987 Plan included the following elements:

(a) *Plan Area Statements*—TRPA created a system of permissible land use maps (i.e. zoning maps) called Plan Area Statements or "PAS's". PAS No. 040 entitled "Incline Village # 1" included Plaintiff's lot and prescribes a residential land use classification denoting single-family dwellings. However, this did not mean that all land owners within PAS No. 040 could build single-family dwellings at their pleasure. A rating and review system for building permit priority was instituted called:

(b) *The Individual Parcel Evaluation System ("IPES")*—IPES, implemented through Ch. 37 of the TRPA Code of Ordinances, attempted to first scientifically channel development to the areas most suitable for it in accordance with the environmental threshold carrying capacities established by TRPA. IPES required TRPA to rank all vacant residential parcels in the basin in accordance with scientific environmental criteria, such as erosion hazard, run-off potential, degree of difficulty of access to the construction site, etc.

After evaluation, TRPA assigned a numerical score to each parcel to determine its priority for development. Under the 1987 Plan, top-ranked parcels would be allowed to seek building permits while others would have to wait until their numerical level was reached. Initial top-ranking parcels were those that scored 725 or above. The Plaintiff's parcel scored 543. Although a procedure for challenging an owner's score was instituted, Plaintiff never pursued that option.

(c) *Transfers of Development Rights*—The 1987 Plan also provided for an elaborate system of transfers of development rights. Transfer development rights operate by allowing a landowner to receive density credits for development proposals in redirection areas or areas designated for transferring development potential from sensitive lands.[4] Plaintiff made no attempt to participate in this program.

(d) *Land Capability Classification Verification and Challenge*—The 1987 Plan also allowed land owners to challenge their land capability ratings and request field inspections and reports. The Plaintiff did not do this.

(e) *Plan Amendment*—The 1980 Compact allows property owners to request amendments to any regional plan and requires the TRPA board to act on such a request for amendment within 180 days. 1980 Compact, Art. V(a). Plaintiff made no attempt to request a plan amendment.

On June 25, 1990, during the pendency of this suit, Plaintiff sold her lot to the State of Nevada for $185,000[5] as part of the state's "buy-out" program of environmentally sensitive Lake Tahoe area property. Plaintiff admits that she received an economic benefit but argues that she did not receive "just compensation" for her land. She argues that the land would have been worth much more than what she sold it for had it been granted a building permit and that the actions, ordinances, and rules of

---

**4.** See *Tahoe–Sierra Preservation Council v. Tahoe Regional Planning Agency*, 638 F.Supp. 126, 132–33 n. 6 (D.Nev.1986), *vacated in part*, 911 F.2d 1331 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1404, 113 L.Ed.2d 459 (1991).

**5.** She had purchased the lot in 1973 for $27,950.

TRPA facially, and as applied to her, caused a taking of her property without just compensation in violation of the Fifth Amendment. She also alleges a substantive due process claim, an equal protection claim, and violations of the Nevada state constitution.[6]

Defendant TRPA's motion for summary judgment makes the following arguments: (1) Plaintiff's sale of her property in 1990 makes this case moot, deprives the court of jurisdiction to hear the case as there is no case or controversy, and deprives Plaintiff of standing; (2) Plaintiff's sale of her property to the State of Nevada constituted a waiver of her claims; (3) Plaintiff's claims are not ripe for adjudication; (4) even on the merits, Plaintiff's takings claim fails; (5) on the merits, Plaintiff's substantive due process claim fails; and (6) on the merits, Plaintiff's equal protection claim fails.

For the reasons discussed below, the court grants TRPA's motion for summary judgment on some claims and denies it as to others.

## DISCUSSION

### I. Does the Sale of Plaintiff's Property Render the Case Moot?

■ Defendant claims that since Plaintiff sold her lot in 1990 there is no case or controversy before this court. TRPA argues that since Plaintiff has already made a profit on the sale of the property there is no actual injury traceable to the defendant. Defendant's argument, however, fails to take into account two important points. First, since Plaintiff's taking claim can best be characterized as a "temporary taking," she properly seeks damages that occurred during a finite time prior to the sale. Second, Defendant fails to differentiate between mootness and causation.

### A. Temporary Taking

In *Tahoe–Sierra Preservation Council v. Tahoe Regional Planning Agency*, 911 F.2d 1331 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1404, 113 L.Ed.2d 459 (1991) [hereinafter *TSPC I*], the Ninth Circuit explained that a land owner can recover for even a "temporary taking" of his or her land:

> *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) ... held that " 'temporary' takings which ... deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation." *Id.* at 318, 107 S.Ct. at 2387. Thus, if Ordinance 81–5 or the 1984 Plan effected a taking, even for a short time, plaintiffs are entitled to just compensation for that temporary taking.

*TSPC I*, 911 F.2d at 1334. Thus, so far as Plaintiff can allege a temporary taking, even for a very short period of time, she has a valid takings action.

### B. Mootness v. Causation

The above discussion of temporary takings leads to Defendant's second argument: although a plaintiff may recover for a temporary taking, there was no taking here because Plaintiff sold her property for a profit. The same Defendant offered a similar argument in *TSPC I* when it alleged that the 1984 Plan could not have affected a taking since it was enjoined by a district court. The *TSPC I* court agreed that, as a matter of *causation*, this was true, but it did not make the case moot. *Id.* at 1334–35; see also *id.* at 1343 (Fletcher, J. concurring). Likewise here, Plaintiff's sale did not moot her temporary taking claim (although it may affect the question of whether she was justly compensated for any tak-

---

**6.** As this court has ruled on previous occasions, a plaintiff's claims under the Nevada constitution are preempted by the TRPA Compact and regional plans since they have the force of federal law. *See, e.g., Stephans v. Tahoe Regional Planning Agency,* 697 F.Supp. 1149, 1152 (D.Nev. 1988) (as federal law, 1987 Plan preempts state law and state constitutional provisions). To the extent that Plaintiff's First Amended Complaint (document # 40) seeks relief under the Nevada constitution, such claims are dismissed and will not be considered here.

ing).[7] The court concludes that the Plaintiff's case is not moot.

## II. *Does the Sale of Plaintiff's Property Waive Her Claims?*

██ According to TRPA, the fact that Plaintiff sold her parcel for "fair market value" to the State of Nevada means that she unequivocally waived any rights she had to sue for compensation for the taking of land that she did not any longer own. To rule otherwise, alleges TRPA, would allow Plaintiff to take "a double dip" from the public till.

The purchase sale agreement executed by Plaintiff and the State exhibits no evidence of waiver of any claim against any party, let alone TRPA. On the contrary, through counsel Plaintiff reaffirmed her position on the waiver issue at the time of sale declaring that she did not waive any claim against TRPA, and further, that she was only selling out of desperation because she felt that TRPA had foreclosed any chance for her to do anything with her property. Regardless of the merits of Plaintiff's "forced sale" argument it is nonetheless apparent that the purchase agreement did not affect a waiver of Plaintiff's claims.

Also, Defendant presents no evidence to support an implied waiver of claims. Forfeiture of claims is disfavored in the law and the Defendant's evidence of a *de facto* waiver would have to be extremely strong to win on such an argument. The court finds no evidence of such a waiver presented by Defendant's moving papers and exhibits. Thus, the court must conclude, as a matter of law, that the Plaintiff did not waive, either explicitly or impliedly, her claims in this case.

## III. *Are Plaintiff's Claims Ripe?*

██ Ripeness is an extremely important prudential doctrine in takings cases. In the regulatory area, not all deprivations of property amount to a taking; compensation is only required for those deprivations that

go "too far." *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 199, 105 S.Ct. 3108, 3123, 87 L.Ed.2d 126 (1985); *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, *reh. denied,* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978). A court must therefore know exactly what deprivation a given regulation caused. "A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." *McDonald, Sommer & Frates v. County of Yolo,* 477 U.S. 340, 348, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285, *reh. denied,* 478 U.S. 1035, 107 S.Ct. 22, 92 L.Ed.2d 773 (1986). Knowing how far the regulation goes requires that "the government entity charged with implementing the regulations [have] reached a final decision regarding the application of the regulations to the property at issue." *Williamson,* 473 U.S. at 186, 105 S.Ct. at 3116. Since almost every takings clause defendant can argue that a given decision is not completely "final," ripeness is an issue in almost every such case.

██ Where the regulation or regulatory scheme in question allows the property owner to apply for a change in or exemption from the regulation(s) (e.g. a zoning variance), a "final decision" requires that the agency charged with implementing the law have turned down at least one request from the disgruntled landowner. *Williamson,* 473 U.S. at 188–89, 105 S.Ct. at 3117–18; *Kinzli v. City of Santa Cruz,* 818 F.2d 1449, 1454, *amended* 830 F.2d 968 (9th Cir.1987), *cert. denied,* 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 861 (1988); *Herrington v. County of Sonoma,* 834 F.2d 1488, *amended* 857 F.2d 567, 569–70 (9th Cir. 1988), *cert. denied,* 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989). "Where such flexibility is built into a law, plaintiffs should first demonstrate that the law nevertheless does not accommodate their demands before they attack it as unconstitu-

---

**7.** To the extent that this argument goes to the merits of the taking claim, it will be discussed below.

tional." *TSPC I*, 911 F.2d at 1344 (Kozinski, J. dissenting in part).

In order to fully examine the ripeness issues in this case, the court must break the case down into four distinct time periods. The first three correspond exactly to the Ninth Circuit's analysis of the chronology in *TSPC I*:

First, there is the period from June 25, 1981 until August 28, 1983. During this time period, Ordinance 81–5 prohibited development of any Class 1, 2, or 3 lots.... However, there was a limited exception on the Nevada side of the basin which permitted TRPA to approve construction of some single-family homes on Class 1, 2, and 3 lots. Secondly, there is the period from August 29, 1983 until April 26, 1984. During this period, the case-by-case approval system on the Nevada side had expired but the prohibition imposed by Ordinance 81–5 was still in effect. This amounted to a complete moratorium on development for approximately eight months. [Third], there is the period after April 26, 1984, when then the 1984 Plan had been approved
. . .

but during which the district court's injunction had prohibited TRPA from approving any building. *TSPC I*, 911 F.2d at 1336. The final period is the one that began with the implementation of the 1987 Plan on July 15, 1987 and ran through the day that the Plaintiff sold her parcel. During this period, the PAS and IPES mechanisms were in place. The court examines each time period individually as to the ripeness issues involved.[8]

A. June 25, 1981—August 28, 1983: Ordinance 81–5

■ Defendant admits that Plaintiff made an application in 1982 under Ord. 81–5 for a building permit for a single-family dwelling pursuant to the exception for Nevada-side residential lots. Both parties

agree, then, that Plaintiff attempted to avail herself of the only method she then had at her disposal to defeat the restrictive "zoning" of her property. TRPA argues, however, that a final decision was never made, and therefore any claim arising out of this period is unripe.

The court disagrees with Defendant. In takings cases, the ripeness doctrine exists to keep the court from hearing cases for which no final and justiciable decision has been rendered. With respect to the period during which Ordinance 81–5 was in effect and Plaintiff's application was pending, the court should only be presently concerned with two questions: (1) Has the Plaintiff done everything that she could have done to get a final answer to her building permit request? (2) Has the Defendant engaged in every procedure that might ultimately result in Plaintiff being granted a building permit?[9] The answer to both questions is "yes."

The court cannot imagine what else the Plaintiff might have done to get a building permit under Ordinance 81–5. She applied, but TRPA took no action prior to the moratorium. After the eight-month moratorium the 1984 Plan and the resulting injunction continued to block consideration of her application. Finally, the 1987 Plan did away with the system under which she applied for her permit.

Defendant admits that the Agency never acted on Plaintiff's application and that the 1987 Plan effectively eliminated the Ordinance 81–5 case-by-case review system and replaced it with the IPES. In fact, a letter written to Plaintiff by TRPA counsel Susan E. Scholley confirmed the fact that the Agency had never taken, and could never take, action on Plaintiff's case-by-case application made under Ordinance 81–5. The letter concluded with these words: "You may consider this letter the final adminis-

---

8. The court notes that the "final decision"/ripeness requirement applies to Plaintiff's other constitutional claims as well, see *Williamson*, 473 U.S. at 192–94, 199–200, 105 S.Ct. at 3119, 3123; *Hoehne v. County of San Benito*, 870 F.2d 529, 532 (9th Cir.1989).

9. After the Supreme Court's recent discussion of ripeness in *Lucas v. South Carolina Coastal Council*, —— U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), these questions the court poses here might even be too strict on the Plaintiff.

trative determination on the status of the case-by-case application."

If TRPA did not act upon Plaintiff's application prior to the chain of events that resulted in the 1987 Plan, and under the 1987 Plan the case-by-case review system ceased to exist, then TRPA would *never* have acted upon Plaintiff's application. The court rules that TRPA's delays (caused by whatever reasons) and the subsequent legal and administrative developments concerning the moratorium, and the 1984 and 1987 Plans, coupled with Ms. Scolley's letter, amounted to the functional equivalent of an outright administrative rejection of Plaintiff's case-by-case application under Ordinance 81–5. An application in perpetual limbo is the same thing as an application which has been denied. Thus, Plaintiff has a ripe claim for the period from June 25, 1981 to August 28, 1983.

### B. August 29, 1983—April 26, 1984: The Moratorium

■ During this period, the so-called "moratorium," no new building was allowed in the Basin. This amounted to a complete land-use freeze. TRPA claims that it acted out of fear that if it granted building permits, it could later be accused of violating the 1980 Compact.[10] However, there is no reason to believe that a temporary taking claim for this period is not ripe. TRPA froze all permits and Plaintiff had no recourse. Thus, the claim is ripe.[11]

### C. April 27, 1984—July 14, 1987: The 1984 Plan and the Injunction

■ Although the court rules below that any claim during this period fails on the merits, it is not unripe. Again, neither party could have taken any action to further Plaintiff's request for a building permit during this period. Although TRPA points to many provisions of the 1984 Plan

under which a landowner might have challenged his or her status, or the Plan itself, such an attempt by a landowner would have been futile since the district court injunction prohibited TRPA from granting any building permit during this period.

### D. July 15, 1987—June 25, 1990: The 1987 Plan

■ TRPA argues that Plaintiff had options under the 1987 Plan of which she failed to take advantage. Therefore, Defendant argues, any claim under the period during which the 1987 Plan was in effect is not ripe. The court agrees. The factual and legal situation presented in the case at bar is identical to the one presented to this court in *Stephans v. Tahoe Regional Planning Agency*, 697 F.Supp. 1149 (D.Nev. 1988). In that case this court stated that

Plaintiff in the case at bar has failed to pursue administrative avenues much like the options found to be dispositive in *Lake Nacimiento Ranch [Co. v. County of San Luis Obispo*, 841 F.2d 872 (9th Cir.1987), *cert. denied*, 488 U.S. 827, 109 S.Ct. 79, 102 L.Ed.2d 55 (1988) ] and *Tahoe–Sierra Preservation Council [v. Tahoe Regional Planning Agency*, 638 F.Supp. 126 (D.Nev.1986), *vacated in part*, 911 F.2d 1331 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1404, 113 L.Ed.2d 459 (1991) ]. Under Article V(a) of the Compact, Plaintiff can request an amendment of any zoning provision in the 1987 Regional Plan that effects her property.... Plaintiff is also entitled to seek an amendment of the 1987 Regional Plan through a field-study based reclassification of the land capability of her property. TRPA Ordinance 20.2.6(4)(d) (May 27, 1987).... Furthermore, Plaintiff in the instant case has also failed to explore her options in regard to the acquisition and transfer of development

---

**10.** The merits of this contention will be discussed below.

**11.** The parties do not seem to specifically identify the moratorium as a separate basis for suit. One might argue that the period during which Ord. 81–5 was in effect is a separate taking from any moratorium period taking. Or, the morato-

rium may just as well be thought of as a period of time during which the damages from any successful temporary taking claim for the Ord. 81–5 period continued to run. Whichever way one conceives of the first two periods outlined here, it is clear to the court that both periods are ripe.

rights. TRPA, Ordinance 34.2–34.3 (May 27, 1987).

*Stephans*, 697 F.Supp. at 1153–54.

Although it is probably true that plaintiffs suing TRPA for a taking do not any longer have to show that they attempted to amend a regional plan under Article V(a) of the 1980 Compact, see *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 938 F.2d 153, 157 (9th Cir.1991) [hereinafter *TSPC II*],[12] this court's former ruling remains clear: if plaintiffs do not avail themselves of the mechanisms in the 1987 Plan for challenging their IPES scores and exploring the possibility of transfers of development rights, their taking claim under the 1987 Plan will not be ripe.[13]

In the instant case it is undisputed that Plaintiff never attempted to obtain an onsite inspection of her property and did not challenge her IPES score. Nor did she pursue a transfer of development rights. Under these circumstances, any claim made for the period of time that Plaintiff's land was subjected to the 1987 Plan is unripe and must be dismissed on summary judgment.[14]

IV. *The Merits of Plaintiff's Takings Claims*

In review, Plaintiff has a ripe temporary takings claim for the following periods of time: (1) for the time that Ordinance 81–5 was in effect, (2) for the time of the eight-month moratorium, and (3) for the period during which the 1984 Plan was in effect but halted by court injunction. Any "facial" challenge to TRPA's actions during these periods must be dismissed on summary judgment. However, as to an "as applied" claim, Plaintiff can sustain a claim of temporary taking during the time Ordinance 81–5 was in effect and during the time of the eight-month moratorium. Finally, Plaintiff has no taking claim under the 1984 Plan.

A. "Facial" Challenge

■■■ A "facial" attack on a land use regulation alleges that the "mere enactment" of the zoning rule constitutes a taking of Plaintiff's property. See *Lake Nacimiento Ranch Co. v. County of San Luis Obispo*, 841 F.2d 872, 877 (9th Cir.1987), *cert. denied*, 488 U.S. 827, 109 S.Ct. 79, 102 L.Ed.2d 55 (1988). The standard for showing that a zoning restriction is facially invalid is very high. *Stephans*, 697 F.Supp. at 1152. The party challenging the zoning in either a facial or as applied taking case must show either that (1) the restriction does not advance a legitimate state interest or (2) that it denies a property owner all economically viable use of his or her land. *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980).

This court and others have already concluded on many occasions that TRPA's interest in preserving the pristine quality of Lake Tahoe and the surrounding basin is a

---

**12.** In *TSPC I* the three-judge panel could reach no majority position on this issue. See *TSPC I*, 911 F.2d at 1336 (per curiam opinion), 1343 (Fletcher, J., concurring), and 1344 (Kozinski, J., dissenting). Apparently, this issue has been resolved by *TSPC II*. See *TSPC II*, 938 F.2d at 157.

**13.** One judge has even taken the position that the possibility of a transfer of development rights *by itself* makes any taking claim unripe. See *TSPC I*, 911 F.2d at 1344 n. 3 (Fletcher, J., concurring) ("If I were to address the 'ripeness' issue, I simply would hold that transfer of the plaintiffs' development rights granted under the 1984 Plan was a prerequisite to any claim against TRPA, rendering any claim unripe.")

**14.** Nor may Plaintiff argue that, due to the sale of her property, she can never "ripen" a claim

under the 1987 Plan, and thus, ripeness should not be an issue of such a claim. First, at the time the suit was filed Plaintiff still owned the property. Thus, at the time when Plaintiff sought redress for an alleged taking under the 1987 Plan, the claim was not ripe. Plaintiff cannot make unripeness go away by selling her property for a profit and then arguing that it is no longer possible for her to ripen the claim. Second, since Plaintiff had legally viable alternatives to pursue the use of her land during the time it was subjected to the 1987 Plan, Plaintiff's act of selling the property forever forecloses the possibility that the court could determine whether or not there was a taking. If the sale of property eliminated the ripeness issue, then every owner could sell his or her property, convert an unripe claim into a ripe one, and sue TRPA. This is not good law.

legitimate state interest. See *Schultz,* slip op. at 19, 22; *Stephans,* 697 F.Supp. at 1152; *Tahoe–Sierra Preservation Council,* No. S–84–816 EJG, slip op. at 12, 14–15 (E.D.Cal. Mar. 27, 1987); *Tahoe–Sierra Preservation Council,* 638 F.Supp. at 133. Plaintiff does not refute this. Thus, the question is whether, facially, any Compact, Plan, or Ordinance of TRPA deprived Plaintiff of all economically viable ·use of her land.

■ 1. Ordinance 81–5 (June 25, 1981—August 28, 1983)—Under Ordinance 81–5, a Nevada-side land owner could apply for a building permit for a single-family dwelling. Thus, the Ordinance did not categorically prohibit Plaintiff from all economically viable uses of her land and is not facially defective.

■■ 2. The eight-month moratorium (August 29, 1983—April 26, 1984)—The moratorium presents a more complicated picture, however. Plaintiff's land was still zoned for single-family residential use, and the fact that a piece of land has a zoned use is fact enough, *per se,* to withstand a facial challenge. See *Stephans,* 697 F.Supp. at 1152 (citing *Agins,* 447 U.S. at 262–63, 100 S.Ct. at 2142–43; *Lake Nacimiento,* 841 F.2d at 877 & n. 3). However, in this case, an eight-month moratorium banned the use for which the property was zoned. Nonetheless, the facial challenge still fails. The terms of the moratorium explicitly included a provision to resurrect Ordinance 81–5 building permit applications at the conclusion of the development freeze. This was later embodied in the 1984 Plan. Thus, on its face, the moratorium did not prohibit all economically viable uses.

■ 3. The 1984 Plan (April 27, 1984—July 14, 1987)—Finally, the 1984 Plan survives any facial attack. First, on its face, it provides development options to owners. Second, this court has already concluded that facial attacks on the 1984 Plan cannot be sustained on their merits. See *Tahoe–Sierra Preservation Council,* 638 F.Supp. at 133 & n. 7 (issue not discussed in *TSPC I*); *accord, Tahoe–Sierra Preservation Council,* No. S–84–816 EJG, slip op. at 22

(E.D.Cal. Mar. 27, 1987). Finally, any taking claim predicated on the 1984 Plan fails on its merits for lack of causation (see discussion below).

In conclusion, since the terms of Ordinance 81–5, the eight-month moratorium, and the 1984 Plan ·did not eliminate, on their faces, all economically viable uses for Plaintiff's land, she can sustain no "facial" taking challenge to any of these TRPA actions.

**B. "As Applied" Challenge**

Since the Supreme Court has never laid down any set rules for considering a plaintiff's taking claim, it relies on an ad hoc factual inquiry in each case. *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 495, 107 S.Ct. 1232, 1247, 94 L.Ed.2d 472 (1987); *accord, Williamson,* 473 U.S. at 191, 105 S.Ct. at 3119; *Penn Central Transport. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). This approach favors "as applied" challenges, i.e. claims in which the plaintiff argues that, under the facts of the particular case, a zoning regulation caused a taking. The court has previously ruled that Plaintiff's complaint may be read as stating an "as applied" claim. See Minute Order of April 14, 1992 (document # 37). Thus, the court now. considers the merits of such· a claim.

As stated above, a Plaintiff in a taking case must show that the regulation at issue either was not substantially related to a legitimate state interest, or deprived Plaintiff of all economically viable use of her land. *Agins,* 447 U.S. at 260, 100 S.Ct. at 2141. Also as discussed above, the focus here is on the second prong of this test, since no one seriously contends that TRPA's actions are not substantially related to the legitimate interest of saving the purity and serenity of the Lake Tahoe Basin. Thus, the court must now turn to the economic impact of Defendant's actions on Plaintiff's property.

1. Discussion of "as applied" doctrine for all time periods in the case—Defendant argues essentially three points on the mer-

its of any takings claim: first, that Plaintiff already received her "reasonable investment-backed expectations" by selling the property for a profit, second, that Plaintiff has been justly compensated by way of the sale of her property to the State of Nevada, and third, that Plaintiff was on notice of potentially restrictive zoning requirements when she bought property in such a highly regulated and protected area. None of these arguments will carry the day at the summary judgment phase.

■ First, whether Plaintiff received her reasonable investment-backed expectations is a factual issue not dependent on the fact of the sale alone. In fact, it is only one inquiry in the ad hoc investigation that a court must conduct when considering an as applied takings claim.

> [T]his Court has generally "been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government...." Rather, it has examined the "taking" question be engaging in essentially ad hoc, factual inquiries that have identified several factors—such as the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the government action—that have particular significance.

*Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 295, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1 (1981) (quoting *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979) (citations omitted)). This fluid, difficult to apply, three-factor test considers the diminution in value of plaintiff's land due to a land use regulation, whether the plaintiff realized his or her reasonable investment-backed expectations, and the intrusiveness of the government's action (i.e. how similar it was to a total physical invasion of plaintiff's land). *Pace Resources, Inc. v. Shrewsbury Township,* 808 F.2d 1023, 1030–32 (3d Cir.), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2482, 96 L.Ed.2d 375 (1987).

These factors cannot be examined with any certainty at this stage of the proceedings. Only after a fully-developed factual presentation to the trier-of-fact may such a decision be rendered. The court is very hesitant on the present record to make any comment at all about the merits of Plaintiff's as applied claims. Suffice it to say that there are serious, material factual disputes with respect to these issues.

■ A related argument is that Plaintiff already received just compensation by selling her property to the State of Nevada under the state's buy-out program. The Ninth Circuit has declined on two occasions to rule whether the availability of a buy-out option affects the merits of a landowner's takings claim against TRPA. See *TSPC II,* 938 F.2d at 156–57; *TSPC I,* 911 F.2d at 1341 n. 9. Thus, this is an issue of first impression before any district court. The court does not believe that Plaintiff's sale has any relevance to any *temporary* takings claim.

Under *First English,* the government must compensate a landowner for any temporary taking. Presumably, the rationale for that decision is the fact that during the pendency of any land use regulation that affects a taking, the plaintiff has been deprived of all economically viable uses of the land (assuming a substantial government interest for the regulation exists in the first place). Thus, the idea of a temporary taking necessarily invokes the notion of "temporary loss." In other words, even if use of the property is eventually restored to the owner, the owner can still sue for a temporary taking for the lack of compensation during the time of the temporary taking. Logically then, it is irrelevant whether the plaintiff later sells the property, even for a profit, after the period of the temporary taking has ended. The temporary taking and the temporary loss, still took place, it was still unconstitutional, and it still must be compensated. Thus, the fact that Plaintiff sold her property should have no impact on any temporary taking claim.[15]

---

15. The result would probably differ in the case of a claimed *permanent* taking. However, the

As to TRPA's "caveat emptor" argument, the court does not accept the analogy to regulated markets. Just because TRPA existed at the time of Plaintiff's purchase does not imply, as a matter of law, that a reasonable buyer would have known about or foreseen future restrictions. Such a fact, if provable, would impact on the factual inquiry described above, but by itself—and certainly at this stage of the litigation—it is not a basis for granting summary judgment.

■■■ 2. The eight-month moratorium (August 29, 1983—April 26, 1984)—Defendant argues that it was required by the terms of the 1980 Compact to suspend the issuance of all building permits pending the adoption of threshold carrying capacities and a regional plan. Article V, section (c) of the 1980 Compact states:

Within 1 year after the adoption of the environmental threshold carrying capacities for the region, the agency shall amend the regional plan so that, at a minimum, the plan and all of its element, as implemented through agency ordinances, rules and regulations, achieves and maintains the adopted environmental threshold carrying capacities.

Article VI, section (b) goes on to instruct:

No project other than those to be reviewed and approved under the special provisions of subdivisions (d), (e), (f) and (g) [not applicable to this case] may be developed in the region without obtaining the review and approval of the agency and no project may be approved unless it is found to comply with the regional plan and with the ordinances, rules and regulations enacted ... to effectuate that plan.

Defendant argues that these two provisions (which have the effect of federal law) required TRPA to suspend issuance of all building permits until it adopted a regional plan.

The court agrees with TRPA's legal analysis of these 1980 Compact provisions, but it does not agree that they necessarily leave Plaintiff with no as applied takings

court can identify no permanent taking in this

claim for the moratorium period. Although TRPA could approve no project in the absence of a regional plan, this fact alone does not explain why threshold carrying capacities were not established until August of 1982 and a regional plan not adopted until April of 1984. It also does not explain why TRPA did not realize that its hands were tied prior to the start of the moratorium in August of 1983.

Thus, although federal law might have prohibited TRPA from granting a building permit prior to the adoption of a new regional plan under the 1980 Compact, TRPA was the party that had control over when the threshold carrying capacities and regional plan might be adopted. For example, if threshold carrying capacities had been established during the first year that the 1980 Compact was in effect, the first regional plan under the Compact would have been entitled the "1981 Plan" instead of the "1984 Plan." It is for a jury to decide whether the delay was reasonable. If it was reasonable, then TRPA was certainly barred by federal law from granting a building permit to Plaintiff, and she would have no claim. However, if the almost four year delay in adopting a regional plan was not reasonable, then it was TRPA who caused the federal law to "kick-in" and deny Plaintiff her opportunity to be reviewed. In such a case, Plaintiff ought to be compensated for TRPA's delay.

This analysis, combined with the court's general discussion in the previous section concerning the inquiry required in as applied takings cases, requires the court to deny summary judgment as to any temporary takings claim Plaintiff might have for the moratorium period.

■■■ 3. The 1984 Plan (April 27, 1984—July 14, 1987)—Plaintiff can sustain no takings claim against TRPA based upon the 1984 Plan. Any such claim would fail for lack of causation. The Ninth Circuit avoided this issue in *TSPC I*, although two of the judges seemed to agree with the correctness of its basic premise. "The [district court's] TRO and injunction, not the Plan, prevented the plaintiffs from building

case.

on their property. The TRO and injunction forbade even the limited development allowed under the Plan." *TSPC I*, 911 F.2d at 1343 (Fletcher, J., concurring). This argument "is an argument about *causation.* It may well be that TRPA cannot be blamed for any diminution of the value of the plaintiffs' land, [and] if true, that fact would show ... that TRPA committed no "taking"...." *Id.* at 1335 (per curiam).

Again, this is an issue of first impression, but as a matter of common sense, TRPA did not cause the 1984 to 1987 portion of Plaintiff's long wait.[16] This argument, combined with the fact that the 1984 Plan explicitly allowed for the resurrection of pending building permit applications leads the court to conclude that a plaintiff could *never* challenge the 1984 Plan. It simply was not ever put into effect. Thus, it could not have caused a taking. Defendant's motion for summary judgment must be granted as to any claim under the 1984 Plan.

### V. *The Substantive Due Process and Equal Protection Claims* [17]

▮▮▮▮▮ A zoning regulation will not violate substantive due process is it is rationally related to a legitimate state objective. *Village of Belle Terre v. Boraas*, 416 U.S. 1, 7–8, 94 S.Ct. 1536, 1540, 39 L.Ed.2d 797 (1974). Absent the showing that a plaintiff is a member of a suspect classification, the regulation will not violate equal protection also where it bears a rational relationship

to a legitimate governmental interest. *Id.* at 8, 94 S.Ct. at 1540. There is no suspect classification involved here. Thus the Plaintiff has a difficult mountain to climb: she must be able to demonstrate that Ordinance 81–5 and/or the moratorium[18] were not rationally related to a legitimate state interest.

The court concludes that Plaintiff cannot sustain these claims. In ruling that a plaintiff could not sustain an equal protection claim against TRPA, Judge Garcia ruled that

> the adoption of environmental threshold carrying capacities which more severely restrict development in some areas of the basin than others, for the purpose of preserving the pristine clarity of the waters of Lake Tahoe, is a legitimate exercise of the police powers delegated to the TRPA by the states of Nevada and California.

*Tahoe Sierra Preservation Council v. Tahoe Regional Planning Agency*, No. S–84–816 EJG, slip op. at 12 (E.D.Cal. Mar. 27, 1987). Later, in also ruling against plaintiff's substantive due process claim the court noted that "the purpose of the two states in forming the Compact, (i.e. to preserve the environmental qualities of the Lake Tahoe Basin and particularly to stop the deterioration in water quality and clarity of Lake Tahoe) is a legitimate police power objective." *Id.* at 14–15. Accord, *Schultz*, slip op. at 19, 22; *Stephans*, 697

---

**16.** Plaintiff argues that TRPA could have amended the 1984 Plan during the pendency of the court injunction. Thus, Plaintiff claims that TRPA's hands were not really tied during this period. Even assuming that this was true, it is irrelevant. No matter what provisions TRPA could have placed in a new amended plan, the injunction still would have prohibited TRPA from granting Plaintiff a building permit.

**17.** The court is not clear as to why Plaintiff's first two causes of action in the First Amended Complaint state claims directly under the Fifth and Fourteenth Amendments for a taking and for denial of equal protection while her third cause of action states claims under 42 U.S.C. §§ 1983, 1985(3) and 1988 for denial of equal protection, a taking, and for violation of substantive due process. First off, counts one and two are redundant with the third. Second, all

constitutional violations in federal court must be pled as § 1983 cases, with very few exceptions (not applicable here). A plaintiff may not usually plead directly under constitutional provisions. Thus, the first two causes of action do not add anything to the third count. As far as the court is concerned, the entire case is "a § 1983" case.

Furthermore, a claim under § 1985(3) requires proof of invidious discrimination based some racial or class-based animus. No such discrimination is alleged here. Finally, there is no "cause of action" under § 1988—it merely allows the prevailing party to collect attorney's fees upon proper motion.

**18.** Remember, any claim against the 1987 Plan is not ripe and any claim against the 1984 Plan fails on the merits.

**1330**

F.Supp. at 1152; *Tahoe–Sierra Preservation Council*, 638 F.Supp. at 133.

This court agrees. In fact, Plaintiff does not protest the fact that the actions that TRPA has taken have been for the legitimate purpose of protecting the Lake Tahoe Basin. The court wonders whether, under the present state of the law, a plaintiff could ever sustain a substantive due process or non-suspect class equal protection claim against a TRPA regulation, ordinance, or action. The court must grant summary judgment in favor of TRPA on these claims.

IT IS, THEREFORE, HEREBY ORDERED that Defendant TRPA's motion for summary judgment (document # 14) and renewed motion for summary judgment (document # 31) are DENIED with respect to any temporary takings claim for the time period June 25, 1981 through April 26, 1984. Said motions are GRANTED as to all other claims and causes of action.